**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-6922

DUSTIN ROBERT WILLIAMSON,

Plaintiff – Appellant,

v.

BRYAN STIRLING; DELORIS CHARLTON; ED CARROLL; DAVID
MILLER; CLARENCE ROGERS,

Defendants – Appellees.

------------------------------

TERRY A. KUPERS; CRAIG HANEY; PABLO STEWART; STUART
GRASSIAN; PROFESSORS AND PRACTIONERS OF PSYCHOLOGY AND
PSYCHIATRY,

Amici Supporting Appellant.

Appeal from the United States District Court for the District of South Carolina, at Rock
Hill.  Mary G. Lewis, District Judge.  (0:15-cv-04755-MGL)

Argued:  September 25, 2018                    Decided:  December 21, 2018

Before KING and KEENAN, Circuit Judges, and John A. GIBNEY, Jr., United States
District Judge for the Eastern District of Virginia, sitting by designation.

Affirmed in part, vacated in part, and remanded by published opinion.  Judge King wrote
the opinion, in which Judge Keenan and Judge Gibney joined.

**ARGUED:** Jeff Philip Johnson, WINSTON & STRAWN LLP, Washington, D.C., for Appellant. Andrew Lindemann, LINDEMANN, DAVIS & HUGHES, PA, Columbia, South Carolina; Daniel C. Plyler, DAVIDSON, WREN & PLYLER, PA, Columbia, South Carolina, for Appellees. **ON BRIEF:** Daniel M. Greenfield, Roderick & Solange MacArthur Justice Center, NORTHWESTERN UNIVERSITY SCHOOL OF LAW, Chicago, Illinois; Charles Klein, WINSTON & STRAWN LLP, Washington, D.C., for Appellant. David A. DeMasters, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees Ed Carroll and Deloris Charlton. Andrew P. Valentine, East Palo Alto, California, Kenneth L. Schmetterer, DLA PIPER LLP (US), Chicago, Illinois, for Amici Curiae.

KING, Circuit Judge:

Dustin Robert Williamson appeals from summary judgment awards made by the district court in South Carolina to several officials of Barnwell County and the State's Department of Corrections (the "SCDC"), with respect to Williamson's 42 U.S.C. § 1983 lawsuit for due process violations. Put succinctly, Williamson maintains that, as a result of actions of the defendant officials, he suffered in solitary confinement for three-and-a-half years while in pretrial detention, in violation of his Fourteenth Amendment rights. Williamson contends that the district court erred in ruling that his period of solitary confinement was not unconstitutionally punitive and that, if he was deprived of any due process protections, the defendants were entitled to qualified immunity. *See Williamson v. Sterling*, No. 0:15-cv-4755 (D.S.C. Apr. 10, 2017), ECF No. 143. As explained below, we affirm the summary judgment awards made by the district court to two officials who were not sufficiently involved in any constitutional deprivations. We vacate the summary judgment awards in favor of two other officials, however, because the court erred in granting them. We therefore affirm in part, vacate in part, and remand for further proceedings.

I.

A.

In November 2015, Williamson — then a twenty-year-old pretrial detainee in one of SCDC's restrictive detention facilities — filed a verified pro se complaint in the District of South Carolina, initiating the lawsuit underlying this appeal. Williamson's

3

initial complaint challenged his conditions of confinement — including their duration — and named as defendants SCDC Director Bryan Stirling, Barnwell County Sheriff Ed Carroll, Deloris Charlton, the Barnwell County jail administrator, and other unidentified officials.[1] In May 2016, Williamson filed his verified pro se first amended complaint, which added as defendants two Deputy Circuit Solicitors, David Miller and Jack Hammack. *See Williamson v. Sterling*, No. 0:15-cv-4755 (D.S.C. May 2, 2016), ECF No. 41 (the "Complaint"). That Complaint constitutes the operative complaint in these proceedings.

The Complaint alleges, inter alia, that the defendants contravened various constitutional rights and is pursued under § 1983 of Title 42. Williamson's Fourteenth Amendment claims underlie this appeal and, construed in the proper light, allege substantive and procedural due process claims. On April 10, 2017, the district court awarded summary judgment to the defendant officials.

In assessing summary judgment awards, we view the facts "in the light most favorable to the nonmoving party." *Bauer v. Lynch*, 812 F.3d 340, 347 (4th Cir. 2016). The facts recited below are viewed in that light and drawn from the record on appeal, which includes the Complaint and various submissions of the parties. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (explaining that a verified complaint is "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations

---

[1] Williamson's initial pro se complaint misspelled the name of defendant Bryan Stirling, which was thus misspelled in the district court record. His name has now been corrected.

4

contained therein are based on personal knowledge"). Notably, the factual allegations of the Complaint are substantially unchallenged.

B.

1.

In August 2013, at the age of seventeen, Williamson was arrested in Barnwell County for murder, armed robbery, and related offenses. Following his arrest, he was denied bail and held in custody at the Barnwell County Detention Center to await trial. Because of the serious nature of the charges, Williamson was assigned to the Detention Center's maximum security unit. While there, Williamson had only an hour a day of recreation — instead of the three hours accorded those in the general population — but otherwise had the same privileges as other pretrial detainees. During the three months he spent at the Detention Center, Williamson was charged with three infractions of the rules of confinement. More specifically, Williamson fought once with an inmate, and he was twice disciplined for placing his spare mattress on the cell floor.

On November 22, 2013, Williamson gave Barnwell County correctional officers a letter addressed to Sheriff Carroll. Carroll was then out of town, but asked Chief Deputy David Deering to open the letter. Williamson's letter ranted against several individuals, confessed to murder, and proclaimed the innocence of another man. It also threatened violence against ten law enforcement officers and Judge Early of the State's Second

Judicial Circuit, which includes Barnwell County. *See* J.A. 324, 326-27.[2] The letter named three persons that Williamson would talk to regarding his threats, including Agent Croft of the South Carolina State Law Enforcement Division ("SLED"). Chief Deputy Deering thus contacted Agent Croft, who — with others — interviewed Williamson later that very day. During the interview, Williamson became "combative" with the officers, repeated his threats, and struck a correctional officer. *See id.* at 324.

Shortly thereafter, a series of phone calls took place involving various officials, including Judge Early and personnel of SLED, the Sheriff's Office, and the Solicitor's Office.[3] According to Deputy Solicitor Miller, it was then decided "that Mr. Williamson needed to be placed in 'safekeeper' status" in SCDC custody. *See* J.A. 201.

2.

South Carolina maintains a "safekeeper" program that derives from a statutory provision that has been implemented by various state regulations. The relevant statutory provision states that:

> The director of the prison system shall admit and detain in [SCDC] for safekeeping any prisoner tendered by any law enforcement officer in this State by commitment duly authorized by the Governor, provided, a warrant in due form for the arrest of the person so committed shall be issued within forty-eight hours after such commitment and detention.

---

[2] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

[3] In South Carolina, the Solicitor's Office is the public prosecutor for a judicial circuit, perhaps called a prosecuting attorney or a district attorney in other jurisdictions.

*See* S.C. Code § 24-3-80. The primary state regulation that implements the safekeeper statutory provision is South Carolina Executive Order 2000-11 (the "Executive Order"). It was promulgated in 2000 by then-Governor Hodges and spells out the "criteria and procedures" for a pretrial detainee's transfer to "safekeeper status" and for his subsequent detention in SCDC custody. Pursuant to the Executive Order, a pretrial detainee may be designated as a safekeeper if he: "(1) is a high escape risk; (2) exhibits extremely violent and uncontrollable behavior; and/or (3) must be removed from the county facility" for his own protection.

To transfer a pretrial detainee to safekeeper status in SCDC custody, the county holding the detainee must prepare and pursue an application that includes the following: (1) an arrest warrant for the detainee; (2) an affidavit of the chief county law enforcement officer explaining the basis for the requested transfer; (3) a certification from the circuit solicitor concurring in the transfer; (4) and a certification that notice of the safekeeping application was given to the detainee's attorney. *See* Executive Order § 2. The county submits its safekeeping application to the SCDC Director, who reviews it and makes a recommendation to the Governor. If the Director recommends approval of the application, he provides the Governor with a proposed order. Upon receiving the Director's recommendation, the Governor determines whether to grant the safekeeping application and issue an appropriate order. *Id*. § 3. If the Governor approves, the county delivers the pretrial detainee into SCDC custody. The county must provide SCDC with "all appropriate documentation and relevant records," including information about any "special medical" needs of the transferred detainee. *Id*. § 4. Pursuant to the Executive

7

Order, the initial safekeeper order is valid for up to 120 days. *Id*. § 5. The safekeeper order may thereafter be renewed "for up to ninety (90) days upon a showing of good cause and/or no material change in circumstances." *Id*.

SCDC has promulgated additional procedures that govern the handling of pretrial detainees who have been designated as safekeepers (the "SK Policy"). According to the SK Policy, male safekeepers are to "be received and processed at Lee Correctional Institution." *See* J.A. 319. The SK Policy confirms that a safekeeper order "may be renewed for up to 90 days at a time" and provides that safekeeper pretrial detainees will be housed in a Special Management Unit ("SMU") and segregated from other SCDC inmates in the SMU. *See id*. at 319-21. Safekeeper pretrial detainees are assigned to confinement classification "SD Level II," the second-most restrictive of five confinement classifications. *See id*. at 321, 421.[4]

3.

Following Williamson's problematic behavior on November 22, 2013, Barnwell County officials promptly prepared a safekeeper application for him. Chief Deputy Deering — acting for Sheriff Carroll — executed an affidavit recounting the threats made in Williamson's letter and in his interview with Agent Croft. Deputy Solicitor Miller certified that he had served notice of the safekeeper application on Williamson's defense

---

[4] The most restrictive confinement classification in the South Carolina system, called "SD Level I," is reserved for those inmates determined to be "substantial security risks." *See* J.A. 421. The conditions imposed on such inmates are in many ways comparable to the treatment of safekeepers in SD Level II. *See id*. at 421, 423, 429.

8

attorney. The safekeeper application included copies of the warrants for Williamson's arrest, plus medical and mental health screening forms for Williamson recently completed by Barnwell County officials. Finally, Judge Early signed a "safekeeping order," prepared by Miller, finding that Williamson had exhibited "extremely violent and uncontrollable behavior" and qualified for safekeeper status. *See* J.A. 211. In fact, however, such a court order was not a required component of the safekeeper application. *See* Executive Order § 2. As a result, the court's "safekeeping order" was "never acted upon or served on anyone." *See* J.A. 201.

On November 22, 2013, SCDC Director Stirling received Barnwell County's safekeeper application for Williamson. Stirling recommended approval thereof to then-Governor Haley, who approved the safekeeper order. On November 25, 2013, Williamson was delivered into SCDC custody. Although SCDC normally housed male safekeepers at the Lee Correctional Institution under the SK Policy, SCDC instead placed Williamson in another facility, that is, the Maximum Security Unit ("MSU") at Kirkland Correctional Institution. Director Stirling attested that the Kirkland MSU has "more security staff," which was appropriate in light of Williamson's threats. *See* J.A. 312.

According to the Complaint, pretrial detainee Williamson was, as a safekeeper, subjected to solitary confinement, with no outdoor exercise and limited access to books and other materials. Other than leaving his cell about twice a week to shower, Williamson was "on lockdown 24 hours a day." *See* J.A. 68. Williamson's defense counsel had difficulty communicating with Williamson under those conditions and sought his transfer to less restrictive custody.

9

In August 2015 — nearly two years after Williamson's transfer to the Kirkland MSU — SCDC transferred him to the Restricted Housing Unit ("RHU") at Lee Correctional Institution. Williamson's conditions of confinement at the Lee RHU, however, largely replicated the conditions imposed on him at the Kirkland MSU.

At a bond hearing conducted in the Second Circuit on November 3, 2015 — more than 700 days after Williamson's transfer to safekeeper status — Williamson's counsel advised the court that Williamson had been "on lock down, 24 hours a day" at the Kirkland MSU, that he remained "locked down 24 hours a day" at the Lee RHU, and that he had limited access to the law library and phones. *See* J.A. 530-31.[5] Clarence Rogers, the Unit Manager at the Lee RHU, attested that safekeepers only leave their cells to shower three times a week, for recreation twice a week, and for an occasional haircut. The SCDC policies reflect that safekeepers receive recreation time in "outdoor cages," separate from other inmates. *See id.* at 307, 321, 423. Safekeepers can only access an automated law library upon request. Additional restrictions at the Lee RHU included the following: no canteen privileges; limited reading materials; no visiting privileges with family and friends; no personal phone calls; and no interactions with other inmates.

In sum, while in safekeeper status, Williamson was solitarily confined in his cell approximately twenty-three hours a day five days a week, and twenty-four hours a day two days a week. He spent those hours in isolation, with almost no human contact other

---

[5] The record contains only an excerpt of the transcript of Williamson's November 2015 bond hearing. It does not reveal the outcome of that proceeding. *See* J.A. 529-32.

10

than interactions with prison staff and communications with his lawyer. According to Williamson, he was so confined until June 2017, when he was transferred from the Lee RHU to the Barnwell County Detention Center for trial — approximately 1300 days after his placement in solitary confinement as a safekeeper. *See* Br. of Appellant 12.[6]

4.

To maintain Williamson in solitary confinement as a safekeeper, Barnwell County officials and SCDC Director Stirling were obliged to obtain renewal safekeeping orders every ninety days. *See* Executive Order § 5. The record, however, does not include all the renewal orders necessary to sustain Williamson's safekeeper status for the prolonged period he was so held. It contains certain memoranda from Director Stirling to Governor Haley recommending renewals and several of the Governor's final approval orders. *See* J.A. 547-63. The record does not, however, contain any requests from Barnwell County for renewal of Williamson's safekeeper status. Director Stirling's memoranda to Governor Haley recite — in boilerplate language — that he "received appropriate documentation from Barnwell County" in support of renewals. *See, e.g.*, *id.* at 550. And Stirling has attested that he regularly received such renewal requests from Barnwell County and found each to be "in order." *See id.* at 312-13. No such documentations, however, are in the record.

---

[6] It is revealed in the appellate briefs that Williamson was acquitted of the murder charge on June 15, 2017, after a jury trial in Barnwell County. *See State v. Williamson*, No. 2013A0610400187 (S.C. 2d Cir. Ct. Gen. Sess.). The record reflects that he was returned from SCDC custody to Barnwell County custody in June 2017. *See* J.A. 14.

11

In sum, despite the Executive Order's requirement that safekeeper renewal requests be based upon "good cause and/or" a showing of "no material change in circumstances," the record does not fully disclose the bases for Williamson's continuing safekeeper designation. The evidence regarding Williamson's conduct while he remained in safekeeper status as a pretrial detainee consists solely of correspondence from the Kirkland MSU staff affirming that, as of May 28, 2015, Williamson had committed no disciplinary infractions while in SCDC custody.

5.

At some point during his solitary confinement as a safekeeper, Williamson began experiencing significant mental health symptoms. His medical records show that SCDC began treating him in May 2015 for "unspecified psychosis, grief, nightmares, [and] depression." *See* J.A. 166. The record also shows that Williamson advised SCDC medical personnel that he previously "had ADHD and bipolar," but that he stopped taking medications in high school. *Id*. at 165. By April 14, 2016 — after about two-and-a-half years of solitary confinement — Williamson was taking anti-psychotic medications, which he had never before used. He continued to receive mental health services — including various prescriptions — from SCDC through at least November 2016.

The record does not reveal the state of Williamson's mental health at the time of his transfer to safekeeper status in November 2013. Section 6 of the Executive Order provides, however, that mentally-ill detainees "are not eligible for safekeeping." The Mental Health Screening Form for Williamson that Barnwell County submitted with his

12

initial safekeeper application does not flag any existing mental health issues. That Form, however, consists only of twelve yes or no questions aimed at evaluating a detainee's risk of suicide. And Director Stirling's memorandum recommending the Governor's approval of Williamson's initial safekeeper application confirms the Executive Order's exclusion of mentally-ill detainees from the safekeeping program, and may indicate its potential applicability to Williamson. Stirling wrote:

> This is to advise you that the documentation [from Barnwell County] is sufficient to grant the [safekeeper] transfer for Detainee Williamson. However, as you are aware, Executive Order 2000-11 specifically states that 'Mentally ill or retarded individuals are not eligible for safekeeping at the Department of Corrections.' Therefore, SCDC reserves the right to return Detainee Williams [sic] to Barnwell County Detention Center.

*See* J.A. 204. Director Stirling did not, however, comment on Williamson's mental health condition at that time. Despite Williamson's emerging mental health symptoms and problems while he remained in safekeeper status, there is no indication in the record that they were considered when that status was repeatedly renewed every ninety days — approximately thirteen times — for three-and-a-half years.[7]

---

[7] According to an appeal brief submitted by "Amici Supporting Appellant," solitary confinement of any duration can have severe psychological and physical effects. This submission, made by several professors and practitioners of psychiatry and psychology, explains that:

> [T]he overwhelming scientific and professional consensus now firmly establishes that solitary confinement (regardless of length) deprives prisoners of basic human needs; produces severe, negative, and atypical psychological and physical symptoms and reactions; and increases the risk of imminent, grave, lasting, and irreversible harm to those who endure it.

*See* Br. of Amici Curiae 25.

13

As noted, on June 15, 2017, a jury acquitted Williamson of the murder charge. *See State v. Williamson*, No. 2013A0610400187 (S.C. 2d Cir. Ct. Gen. Sess.). In February 2018, Williamson pleaded guilty to armed robbery and was sentenced to time served plus five years of probation. *See State v. Williamson*, No. 2013A0620100094 (S.C. 2d Cir. Ct. Gen. Sess.).[8] The remaining charges against him were dismissed.

C.

1.

The pro se verified Complaint alleged, inter alia, that the defendants had erroneously designated Williamson as a safekeeper, imposed punitive conditions on him without notice and hearing, and thereby denied his due process rights. Supporting the due process claims, the Complaint included the following allegations:

- Williamson was not granted "a hearing or a notice" before his "punitive" removal from the Barnwell County Detention Center, *see* Complaint ¶ 10;

- Williamson did not receive notice or a hearing before his transfer to SCDC custody and the SCDC MSU "for punitive reasons," *id*. ¶ 11;

- While in SCDC custody, Williamson wrote various corrections officials seeking information regarding the basis for his designation as a safekeeper, *see id*. ¶¶ 13-21;

---

[8] The parties freely refer to Williamson's guilty plea and release from custody but do not identify any record evidence supporting those events. That said, Williamson's state court records — which are hereby noticed — reflect his plea and show that he was thereafter released from SCDC and Barnwell County custody, subject to conditions of probation. *See State v. Williamson*, No. 2013A0620100094 (S.C. 2d Cir. Ct. Gen. Sess.); *see also Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (collecting decisions and judicially noticing guilty plea).

- Williamson's conditions at both the Lee and Kirkland Correctional Institutions were "punitive," *id*. ¶¶ 22-23, 25-30; and

- Williamson was a pretrial detainee protected from "any punishment" but he nevertheless remained "on lockdown 24 hours a day," *id*. ¶ 26.

The Complaint included additional allegations setting forth Williamson's "Legal Claims," though it did not identify separate causes of action. Williamson invoked the "14th Amendment Due Process Clause" in discussing the lack of notice or hearing prior to his transfer to SCDC as a safekeeper. *See id*. ¶ 38. He identified two "liberty interest[s]" that had been infringed. *Id*. Williamson characterized the first liberty interest as arising from his "substantive due process" right to be free from "any type of punishment" as a pretrial detainee, as established in 1979 by the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520 (1979). *See id*. He asserted a separate liberty interest arising from South Carolina's safekeeper regulations. *See id*. ¶¶ 39-41. Thus, Williamson raised, inter alia, two distinct theories of liability: one theory — the substantive due process claim — derived from the punitive conditions imposed on him as a safekeeper; and the second theory — the procedural due process claim — arose from lack of notice and hearing regarding his safekeeper status. Based upon those due process claims and supporting allegations, his pro se Complaint sought declaratory and injunctive relief, punitive damages, and such "additional relief" as the court deemed "just, proper, equitable." *See id*. ¶¶ 46-57.

In September 2016, the defendants each moved for summary judgment, asserting, among other defenses, that they were not personally responsible for the challenged conduct and the conditions of Williamson's solitary confinement, that Williamson's

15

safekeeper status was not punitive, and that — in any event — they were entitled to qualified immunity. Deputy Solicitor Miller also contended that he was entitled to prosecutorial immunity. The district court referred the defendants' summary judgment motions to a magistrate judge for proposed findings and recommendations.

In March 2017, the magistrate judge recommended that each of the defendants' motions be granted. *See Williamson*, No. 0:15-cv-4755 (D.S.C. Mar. 21, 2017), ECF No. 138 (the "Magistrate Report"). The Magistrate Report determined that, as to Williamson's First, Fourth, and Sixth Amendment claims, he failed to show personal responsibility by any of the defendants for any violations of those rights, as required for a § 1983 claim.

With respect to his Fourteenth Amendment due process allegations — the only claims Williamson pursues in this appeal — the Magistrate Report recommended awarding summary judgment to each of the defendants, for two reasons. First, the Report concluded that Williamson had not been unconstitutionally punished. Although it recognized that the Due Process Clause protects pretrial detainees from restrictions that amount to punishment, the Report determined that Williamson's prolonged conditions of solitary confinement did not constitute punishment. The Report concluded that Williamson's confinement was not punishment, explaining as follows:

> Williamson has provided no evidence of an "express intent to punish" by the defendants, and the defendants' assertion that Williamson's transfer was necessary for security purposes provides an unrefuted nonpunitive government objective that precludes a reasonable inference of punitive intent.

16

*See* Magistrate Report 6. According to the Report, the defendants' assertion of necessity predicated on security purposes sufficed to prove that, despite his prolonged period of solitary confinement, Williamson had not been unconstitutionally punished as a pretrial detainee.

Second, the Magistrate Report determined that the controlling law was unsettled on whether pretrial detainees transferred into "more restrictive housing for administrative purposes" are "owed any level of process under the Fourteenth Amendment." *See* Magistrate Report 7. The Report thus recommended that each defendant be granted qualified immunity. Because the Report concluded that its analysis disposed of Williamson's claims, it did not address any issues concerning the defendants' personal involvement in due process violations or Deputy Solicitor Miller's assertion of prosecutorial immunity.

In April 2017, the district court adopted the Magistrate Report — over Williamson's objections — and awarded summary judgment to each of the defendants. *See Williamson*, No. 0:15-cv-4755 (D.S.C. Apr. 10, 2017), ECF No. 143 (the "Summary Judgment Order"). In response to one of Williamson's objections, however, that Order authorized Williamson to amend the Complaint and name additional defendants. Nevertheless, the court simultaneously notified Williamson of his "right to appeal this Order" within thirty days. *See id.* at 3.

Soon thereafter, Williamson filed a second amended complaint. *See Williamson*, No. 0:15-cv-4755 (D.S.C. May 2, 2017), ECF No. 150. That revised pro se pleading contained substantially the same allegations as the operative Complaint that was disposed

17

of by the Summary Judgment Order, but it added two new defendants: RHU manager Clarence Rogers and Debra Eastridge, an SCDC mailroom clerk. During the following week, Williamson noted his appeal from the Summary Judgment Order.

In response to the second amended complaint, the previously named defendants — Director Stirling, Barnwell County jail administrator Charlton, Sheriff Carroll, Deputy Solicitor Miller, and Deputy Solicitor Hammack — filed new motions to dismiss, which were also referred to the magistrate judge. In June 2017, the magistrate judge recommended the dismissal of the second amended complaint. *See id.*, ECF No. 166 (the "Second Magistrate Report"). The Second Magistrate Report concluded that, because the district court had already awarded summary judgment to the previously named defendants, Williamson's claims against Stirling, Charlton, Carroll, Miller, and Hammack were "no longer before the Court." *Id*. at 2 n.2. The Second Magistrate Report therefore recommended denying their motions to dismiss as moot.

The substance of the Second Magistrate Report focused on Williamson's Fourteenth Amendment claims against the two defendants newly named in the second amended complaint, Rogers and Eastridge (neither of whom had made an appearance). Applying the screening provisions of 28 U.S.C. § 1915A, the magistrate judge determined that — as to Rogers and Eastridge — Williamson failed to state a claim upon which relief could be granted. The Second Magistrate Report thus recommended dismissal of the second amended complaint as to Rogers and Eastridge "without prejudice and without issuance and service of process." *Id*. at 10.

18

Later that month, the district court adopted the Second Magistrate Report. The court thus dismissed the second amended complaint against Rogers and Eastridge without prejudice and without issuance and service of process. The court also denied as moot the pending motions to dismiss of the five defendants that had already been awarded summary judgment. On the same day, the court entered summary judgment in favor of defendants Stirling, Charlton, Carroll, Miller, and Hammack, and dismissed them with prejudice. *See id.*, ECF No. 172. On the other hand, the judgment dismissed Rogers and Eastridge without prejudice. *See id.*

Soon thereafter, on June 29, 2017, Williamson's objections to the Second Magistrate Report arrived at the district court. On July 19, 2017, Williamson — who had been proceeding pro se — obtained counsel. That same day, he filed a new notice of appeal, in that his initial notice of appeal had been dismissed. On the following day, the district court entered an "amended order" that again adopted the Second Magistrate Report and again dismissed the second amended complaint. *See Williamson*, No. 0:15-cv-4755 (D.S.C. July 20, 2017), ECF No. 182 (the "Amended Final Order").

The Amended Final Order correctly observed that Williamson's second notice of appeal transferred jurisdiction to the court of appeals. *Id.* at 1 (citing *Grand Jury Proceedings Under Seal v. United States*, 947 F.2d 1188, 1190 (4th Cir. 1991)). With that caveat, the Order identified an exception to the jurisdictional transfer that authorizes a district court to exercise jurisdiction over "matters in aid of the appeal." *Id.* Proceeding "in aid of" Williamson's appeal and in "the interest of justice," the district court then

19

considered and rejected Williamson's objections to the Second Magistrate Report. *Id.*[9] The court then — for the second time — dismissed the second amended complaint as to the two new defendants (Rogers and Eastridge) without prejudice and without issuance and service of process. It also again denied the pending motions to dismiss as moot. On July 20, 2017, the court entered an amended judgment. *See Williamson*, No. 0:15-cv-4755 (D.S.C. July 20, 2017), ECF No. 183 (the "Amended Judgment"). The Amended Judgment again awarded summary judgment to defendants Stirling, Charlton, Carroll, Miller, and Hammack, and it again dismissed the claims against them with prejudice. The Amended Judgment also dismissed the claims against Rogers and Eastridge without prejudice. On July 25, 2017, Williamson again noticed an appeal — his third such notice — from the judgments and all rulings related thereto. During the pendency of his appeal, Williamson voluntarily dismissed his claims against Hammack (in September 2017), and his claims against Eastridge (in November 2017).

2.

We heard argument in this appeal on September 25, 2018. Because no jurisdictional issue had been interposed by counsel, we identified our jurisdictional concerns sua sponte and requested the parties to submit supplemental briefs on two issues:

---

[9] To the extent a tardy filing of Williamson's objections to the Second Magistrate Report might have waived appellate review of the claims addressed therein, those claims are not before us. Put succinctly, Williamson has sufficiently preserved his right of appellate review of the issues we address. *See* 28 U.S.C. § 636(b)(1).

- Whether an appealable final decision was ever rendered by the district court, as required by 28 U.S.C. § 1291; and

- The status of defendant/appellee Clarence Rogers in the district court and on appeal.

*See Williamson v. Stirling*, No. 17-6922 (4th Cir. Sept. 25, 2018), ECF No. 70. On October 10, 2018, the parties made their supplemental appellate submissions. That same day, Williamson filed a notice and stipulation in the district court that dismissed defendants Rogers and Eastridge with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A). *See Williamson*, No. 0:15-cv-4755 (D.S.C. Oct. 10, 2018), ECF No. 189. Williamson also declined to pursue any appellate claims against Rogers.

In their supplemental appellate submissions, the four remaining defendant-appellees contend that, because the district court had dismissed Williamson's claims against Rogers and Eastridge without prejudice, the court never entered an appealable final decision for purposes of § 1291, depriving this Court of appellate jurisdiction.[10] On the other hand, Williamson contends that the court's various entries of judgments and the Amended Judgment constitute appealable final decisions. In the alternative, Williamson asserts that, if the Amended Judgment was not an appealable final decision when entered, his dismissals with prejudice of Rogers and Eastridge have conclusively established the existence of § 1291 jurisdiction. That is, Williamson steadfastly contends that his due

---

[10] As required by Federal Rule of Appellate Procedure 28, both parties' initial appellate briefs included jurisdictional statements. Each represented therein that appellate jurisdiction was authorized under § 1291. The appellees' supplemental submission — contending that the district court never rendered a final decision — contradicts their initial appellate brief.

21

process claims against defendants Stirling, Charlton, Carroll, and Miller are properly before this Court.[11]

## II.

The federal courts of appeals "have an independent obligation to verify the existence of appellate jurisdiction," even in the absence of a jurisdictional challenge from one of the parties. *See Porter v. Zook*, 803 F.3d 694, 696 (4th Cir. 2015) (internal quotation marks omitted). And we must consider a question of jurisdiction before we address any issue concerning the merits of an appeal. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998). As to the merits, we review de novo an award of summary judgment, viewing the facts in the light most favorable to the non-moving party. *See Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). Summary judgment is only appropriate if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Bauer*, 812 F.3d at 347 (citing Fed. R. Civ. P. 56(a)). We also review de novo a district court's determination that a defendant is entitled to qualified immunity. *See Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). Lastly, in addressing Williamson's claims, we are obliged to liberally construe the allegations of his pro se verified Complaint. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

---

[11] As explained above, Williamson initially pursued his appeal against Stirling, Charlton, Carroll, Miller, Hammack, Rogers, and Eastridge. During the appeal, however, he has dismissed Hammack, Rogers, and Eastridge.

III.

This appeal implicates important questions concerning the treatment of pretrial detainees, particularly with respect to their placement and holding in solitary confinement. Before we can address those questions, however, we must resolve two threshold issues: whether we possess appellate jurisdiction and whether Williamson's § 1983 claims for due process violations are moot.

A.

The jurisdiction of a court of appeals is generally limited to the review of final decisions made by the district courts, within the meaning of 28 U.S.C. § 1291, and to the review of certain interlocutory orders, as provided for in 28 U.S.C. § 1292. *See Goode v. Cent. Va. Legal Aid Soc'y, Inc.*, 807 F.3d 619, 623 (4th Cir. 2015). Because this appeal does not fall under any of the narrow categories identified in § 1292, we must assess whether the district court rendered a final decision within the meaning of § 1291.

This jurisdictional issue arises for the most part from the fact that two defendant officials — newly named in Williamson's second amended complaint — were initially dismissed without prejudice. Generally, a plaintiff "may not appeal the dismissal of his complaint without prejudice unless the grounds for dismissal clearly indicate that no amendment in the complaint could cure the defects in the plaintiff's case." *Domino Sugar Corp. v. Sugar Workers Local Union 392*, 10 F.3d 1064, 1067 (4th Cir. 1993) (internal quotation marks omitted). The controlling question is simply whether a dismissal without prejudice nevertheless "end[s] the litigation on the merits and leave[s] nothing for the court to do but execute the judgment." *Goode*, 807 F.3d at 623 (internal

23

quotation marks omitted). To answer that question, we are entitled to consider whether the court "merely dismiss[ed] the complaint," or instead "dismissed the action in its entirety." *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 345 (4th Cir. 2005); *see also Goode*, 807 F.3d at 624. Lastly, an order is generally not a final decision until the court "has resolved *all* claims as to all parties." *Porter*, 803 F.3d at 696.

The procedural circumstances of this litigation — although unusual — show that the Amended Judgment of July 20, 2017, constitutes an appealable final decision. On the one hand, a dismissal without prejudice "for failure to plead sufficient facts" generally is not deemed to be final. *See Goode*, 807 F.3d at 624. That said, the "specific facts of the case" suggest that, in this situation, the court dismissed Williamson's lawsuit "in its entirety." *See Chao*, 415 F.3d at 345. Importantly, as related in the Amended Final Order, the district court was acting "in aid of" Williamson's appeal, recognizing an exception to our assumption of jurisdiction upon the filing of a notice of appeal. *See* Amended Final Order 2.

Regardless of such legal distinctions, however, we need not predicate appellate jurisdiction solely on the finality of the Amended Judgment at the time it was entered. In appropriate "procedural circumstances," we can and will take "a practical approach to finality." *See Equip. Fin. Grp., Inc. v. Traverse Comp. Brokers*, 973 F.2d 345, 347 (4th Cir. 1992). As our distinguished former colleague Judge Sprouse carefully explained, the doctrine of "cumulative finality" authorizes us to exercise appellate jurisdiction where all claims as to all parties are disposed of while the appeal is pending, and where the district court could have certified the challenged order for immediate appeal pursuant to Federal

24

Rule of Civil Procedure 54(b). *See id.* at 345-47; *see also Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 479 (4th Cir. 2015). Those conditions are satisfied here.[12] The district court could have certified its Summary Judgment Order for immediate appeal under Rule 54(b), and Williamson has now dismissed Rogers and Eastridge with prejudice. Thus, all of Williamson's claims in the district court have been finally resolved. In these circumstances, the doctrine of cumulative finality applies, and we possess § 1291 jurisdiction in this appeal. *See Houck*, 791 F.3d at 479.

B.

Turning to the second threshold issue, the defendants contend on appeal that Williamson's § 1983 due process claims are now moot because the relief he sought in his pro se complaints is no longer available. Because "we do not have jurisdiction over a case if an actual controversy does not exist at the time of appeal," we are obliged to resolve the defendants' mootness contention before assessing the merits of Williamson's claims. *See Cent. Radio Co. v. City of Norfolk*, 811 F.3d 625, 631 (4th Cir. 2016).

According to the defendants — as explained in their initial appellate brief — Williamson's pro se Complaint sought only punitive damages and injunctive relief. The

---

[12] To amplify our discussion somewhat, the operative documents concerning appellate jurisdiction are most likely Williamson's second notice of appeal (filed on July 19, 2017), and the district court's Amended Judgment (entered on July 20, 2017). Williamson actually filed three notices of appeal. The first was from the Summary Judgment Order and was voluntarily dismissed. The second and operative notice was filed prematurely. His third and final notice was filed after the Amended Judgment. Williamson's second notice of appeal was timely and, to the extent it was premature — in that it preceded the final decision — it is "treated as filed on the date of and after the entry" of the final decision of July 20, 2017. *See* Fed. R. App. P. 4(a)(2).

25

defendants then emphasize that punitive damages are unavailable when compensatory damages are neither sought nor awarded. And although Williamson sought injunctive relief to secure his release from SCDC custody, the defendants argue, he has now been released from such custody. Because the defendants' contention of mootness construes Williamson's lawsuit too narrowly and the doctrine of mootness too broadly, their mootness contention fails.

First, the defendants misapprehend Williamson's requests for relief. Williamson's pro se Complaint seeks any "additional relief this court deems just, proper, equitable." Complaint ¶ 57. And it is fundamental that a pro se complaint must be "liberally construed." *Erickson*, 551 U.S. at 94. Applying this principle to the Complaint, Williamson therein seeks all appropriate relief that is available. Because he alleges actual injuries — i.e., deterioration of his mental health — such relief could readily extend to compensatory as well as nominal damages. *See Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 218, 221 (4th Cir. 2007) (affirming award of compensatory damages for substantive due process violation where plaintiff proved actual injury); *Burt v. Abel*, 585 F.2d 613, 616 (4th Cir. 1978) (per curiam) (explaining that, to recover more than nominal damages on procedural due process claim, plaintiff must identify "some independent compensable harm"). Thus, Williamson's broad requests for just, proper, and equitable relief — construed in the proper light — encompass compensatory and nominal damages, and also could permit the recovery of punitive damages. Put simply, Williamson may yet obtain some of the relief he seeks, and his claims are therefore not moot. *See Knox v. Serv. Emps. Int'l Union, Local 1000*,

26

567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.").

IV.

A.

Having resolved the threshold procedural and jurisdictional questions, we turn to the summary judgment awards made to defendants Stirling, Charlton, Carroll, and Miller on the Fourteenth Amendment due process claims.[13]  Before delving into the specific inquiries that apply to Williamson's substantive and procedural due process claims, however, we address the contention of the four remaining officials in the appeal that they are not personally responsible for any constitutional deprivations.  Although the district court did not reach the personal responsibility issue, we are entitled to affirm on any ground apparent from the record.  *See United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).  In that regard, we are satisfied that Williamson has sufficiently shown — for summary judgment purposes — that Director Stirling and Sheriff Carroll were personally responsible for his solitary confinement.  On the other hand, we will affirm the summary judgment awards made to Detention Center administrator Charlton and to Deputy

---

[13] As explained above, the Summary Judgment Order awarded summary judgment to five defendants, that is, Stirling, Charlton, Carroll, Miller, and Hammack.  Because Williamson dismissed Hammack during the appeal, we address only the summary judgment awards made to the remaining four officials.

27

Solicitor Miller because Williamson has not sufficiently shown their personal involvement therein.

Section 1983 authorizes a plaintiff to sue for an alleged deprivation of a federal constitutional right by an official acting "under color of" state law. *See Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (quoting 42 U.S.C. § 1983). To establish personal liability under § 1983, however, the plaintiff must "affirmatively show[] that the official charged acted personally in the deprivation of the plaintiff's rights." *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks omitted). That is, the official's "own individual actions" must have "violated the Constitution." *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Importantly, mere knowledge of such a deprivation does not suffice. *Wright*, 766 F.2d at 850.

Director Stirling and Sheriff Carroll played key roles in securing and maintaining Williamson's confinement under the safekeeper program. Their involvement began with Barnwell County's initial application for Williamson's transfer to safekeeper status in November 2013 and continued through the renewals of that status for three-and-a-half years. Throughout that period, Stirling and Carroll authorized and secured Williamson's safekeeper status by seeking and recommending approval by the Governor of the relevant safekeeping orders. *See* Executive Order §§ 2, 5; J.A. 311-13, 547-63, 608. Thus, Williamson has sufficiently demonstrated Director Stirling's and Sheriff Carroll's

28

personal involvement in his extended period of solitary confinement and the related events underlying his § 1983 due process claims. *See Wright*, 766 F.2d at 850.[14]

By contrast, Williamson has failed to demonstrate that Charlton and Miller were personally involved in any deprivations of his due process rights. Charlton is the jail administrator for Barnwell County. *See* J.A. 55. She signed off on the handling of Williamson's infractions while he was in Barnwell County's custody. *See id*. at 47-51. Williamson alleges that Charlton, along with Sheriff Carroll, failed to provide Williamson with notice or a hearing regarding his transfer from Barnwell County custody to safekeeper status. *Id*. at 70. We are unable to infer, however, that this allegation is based on any personal knowledge by Williamson of the Detention Center's hierarchy or divisions of responsibility. As a result, we are unable to accept that allegation as probative evidence. *See Williams*, 952 F.2d at 823. On the other hand, Charlton has personally attested that she had "no involvement in the request or execution of placing" Williamson in SCDC custody as a safekeeper. *See* J.A. 271. And there is no evidence to contradict her sworn statement. Williamson thus falls short of establishing Charlton's personal involvement in the alleged due process violations and his claims against her must be rejected.

---

[14] The four defendants summarily contend that, because the Governor is the final decisionmaker under the safekeeper statute, no other county or state official can be "personally responsible" for a pretrial detainee's transfer to safekeeper status. *See* Br. of Appellees 26-28. The defendants, however, have not produced any legal authority supporting that proposition.

The issue of Deputy Solicitor Miller's personal involvement in the due process violations presents a closer question. Miller knew of Williamson's problematic conduct on November 22, 2013, but the record fails to show that he sought or secured Williamson's transfer to safekeeper status. *See* J.A. 200-01. Miller participated in Williamson's initial safekeeper application in three minor ways. Acting on a request, he prepared an order for Judge Early. Miller later discovered, however, that the order was not required for the safekeeper application, and it "was never acted upon or served on" any relevant party. *Id*. at 201. Miller also served a copy of the safekeeping application on Williamson's defense counsel. And the record suggests that Miller helped deliver some of Williamson's paperwork to the SCDC officials. *See id*. at 201, 214-25. On this record, those events are insufficient to show that Miller was personally involved in any due process deprivations. In these circumstances, no reasonable trier of fact could find that Miller's "own individual actions" violated the Constitution. *See Iqbal*, 556 U.S. at 676.

Accordingly, defendants Charlton and Miller were entitled to summary judgment on each of the due process claims because they lacked sufficient personal involvement in the alleged constitutional deprivations. We will therefore affirm the summary judgment awards made to them by the district court.

B.

We now turn to Williamson's substantive and procedural due process claims against Director Stirling and Sheriff Carroll. Although the Complaint alleges both substantive and procedural due process violations, the Magistrate Report and the district

30

court failed to properly distinguish and analyze those claims. That error compels us to vacate the summary judgment awards made to Stirling and Carroll. In that regard, we will identify the distinct inquiries that govern Williamson's claims — as a pretrial detainee — for substantive and procedural due process violations.

1.

Williamson filed the Complaint while representing himself pro se. As a result, we are obliged to construe its allegations liberally and with the intent of doing justice. *See Erickson*, 551 U.S. at 94 (citing Fed. R. Civ. P. 8). Viewed in that light, Williamson has alleged substantive and procedural due process claims that arise from his three-and-a-half years of solitary confinement.

The portion of the Complaint titled "Legal Claims" invokes the term "substantive due process" and alleges that Williamson was unconstitutionally punished, in contravention of *Bell v. Wolfish*, 441 U.S. 520 (1979). *See* Complaint ¶¶ 38, 42. Evaluating those allegations in context, the Complaint sufficiently states a substantive due process claim. The Complaint also identifies two "liberty interest[s]" that were allegedly violated, and it asserts that Williamson "should have been given a trial type hearing" before being transferred to safekeeper status. *See id*. ¶¶ 38-42. Liberally construed, those contentions and the related allegations are sufficient to also state a viable procedural due process claim.

We are therefore satisfied that the Complaint alleges substantive and procedural due process claims arising from Williamson's solitary confinement as a safekeeper. In the district court, however, neither the parties nor the court differentiated those claims.

31

The Magistrate Report impliedly considered both claims, but failed to explicitly distinguish them. *See* Magistrate Report 5-9. And neither that Report nor the Summary Judgment Order properly applied the legal principles that control substantive and procedural due process claims being pursued by a pretrial detainee. As explained below, the court thus erred in awarding summary judgment to Director Stirling and Sheriff Carroll on the ground that they had not contravened Williamson's due process rights.

2.

a.

Put most simply, it is settled that pretrial detainees possess a constitutional right "to be free from punishment." *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979). That right — as to state detainees — derives from the Due Process Clause of the Fourteenth Amendment, which protects such detainees from punishment "prior to an adjudication of guilt in accordance with due process of law." *See id*. & n.16.[15] The courts of appeals have applied this settled principle to substantive and procedural due process claims pursued by pretrial detainees. *See, e.g.*, *Dilworth v. Adams*, 841 F.3d 246, 251-53 (4th

---

[15] The Supreme Court's *Bell* decision assessed the claims of pretrial detainees in the federal system and thus applied the Fifth Amendment's Due Process Clause, which prohibits the federal government from depriving any person of "life, liberty, or property, without due process of law." *See* U.S. Const. amend. V; *see also Bell*, 441 U.S. at 523. The Court recognized, however, that those very principles also apply to state pretrial detainees by way of the Fourteenth Amendment, which provides that no "State [shall] deprive any person of life, liberty, or property, without due process of law." *See* U.S. Const. amend. XIV, § 1; *see also Bell*, 441 U.S. at 535 n.16; *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005) (applying due process principles of *Bell* to state pretrial detainees under Fourteenth Amendment).

Cir. 2016) (applying *Bell* to pretrial detainee's procedural due process claim); *Ford v. Bender*, 768 F.3d 15, 24-27 (1st Cir. 2014) (distinguishing types of due process claims); *Slade v. Hampton Roads Reg'l Jail*, 407 F.3d 243, 250 (4th Cir. 2005) (assessing pretrial detainee's substantive due process claim under *Bell* principles).[16]

Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility. *See, e.g.*, *Slade*, 407 F.3d at 250 (evaluating pretrial detainee's substantive due process claim challenging jail upkeep fees under Due Process Clause and *Bell*); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) (assessing pretrial detainee's conditions of confinement claim under Due Process Clause and *Bell*). Such substantive due process claims advance a central purpose of *Bell*: to ensure that pretrial detainees are not punished before they have been found guilty. *See Bell*, 441 U.S. at 535, 539; *see also Sandin v. Conner*, 515 U.S. 472, 484 (1995) (emphasizing *Bell*'s concern that pretrial detainee could not be punished "for the crime for which he was indicted via preconviction holding conditions"). The controlling inquiry for such a claim is whether the conditions imposed on the pretrial detainee constitute "punishment." *See Bell*, 441

---

[16] The *Bell* decision did not expressly identify a pretrial detainee's right to be free from punishment as a fundamental right implicating substantive due process or as a liberty interest triggering procedural protections. The Court therein sought to prevent punishment "without due process," and also categorically barred the punishment of pretrial detainees. *Compare* 441 U.S. 520, 535 & n.17, *with id*. at 537. Thereafter, in *United States v. Salerno*, the Court confirmed that *Bell* had advanced a substantive due process right. *See* 481 U.S. 739, 746, 749 (1987). The federal appellate courts — including this Court — have sustained both types of due process claims on the basis of *Bell*. *See, e.g.*, *Ford*, 768 F.3d at 24.

U.S. at 535-39; *Martin*, 849 F.2d at 870.  In order to prevail on a substantive due process claim, the pretrial detainee must show that a particular restriction was either: "(1) imposed with an expressed intent to punish or (2) not reasonably related to a legitimate nonpunitive governmental objective."  *See Slade*, 407 F.3d at 251.

A pretrial detainee challenging individually-imposed restrictions — as opposed to shared conditions of confinement — is entitled to pursue a procedural due process claim. *See, e.g.*, *Dilworth*, 841 F.3d at 250-52.  In *Bell*, the Supreme Court distinguished between "punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may."  *See* 441 U.S. at 537.  Such "regulatory restraints" include administrative and disciplinary measures used by responsible jail officials "to maintain security and order" in detention facilities. *See id.* at 540.  Accordingly, jail officials are entitled to discipline pretrial detainees for infractions committed in custody and to impose restrictions for administrative purposes without running afoul of *Bell*.  *See, e.g.*, *Mitchell v. Dupnik*, 75 F.3d 517, 524 (9th Cir. 1996) (explaining that jail may discipline pretrial detainee to "preserv[e] 'internal order and discipline'") (quoting *Bell*, 441 U.S. at 546).  That said, such administrative and disciplinary measures also implicate a pretrial detainee's liberty interest in remaining free from punishment.  *See Dilworth*, 841 F.3d at 251; *Surprenant v. Rivas*, 424 F.3d 5, 17 (1st Cir. 2005).  Thus, proportional restrictions imposed on a pretrial detainee for a permissible purpose can trigger due process protections, pursuant to *Bell* and the Due Process Clause.  *See Dilworth*, 841 F.3d at 252; *see also Jacoby v. Baldwin County*, 835 F.3d 1338, 1347-48 (11th Cir. 2016) (collecting decisions).

34

The level of procedural due process to which a pretrial detainee is entitled in a particular situation, however, depends on context. More specifically, a pretrial detainee's procedural protections vary according to whether a restriction was imposed for disciplinary or administrative purposes. If the restriction imposed by jail officials is a disciplinary one — arising from a pretrial detainee's misconduct in custody — the detainee is entitled to notice of the alleged misconduct, a hearing, and a written explanation of the resulting decision. *See Dilworth*, 841 F.3d at 252-54 (recognizing that pretrial detainees are "entitled under *Bell* to procedural due process in connection with any 'punishment' imposed" by detention facility, including notice and hearing).

If, however, a restriction imposed by the jail officials is for administrative purposes — which include managerial and security needs — the level of process to which the pretrial detainee is entitled is diminished. In those situations, the courts of appeals have generally concluded that some level of process must be afforded to the pretrial detainee, even if the process is provided after the restriction has been imposed. *See Dilworth*, 841 F.3d at 255 (explaining that jail may take "immediate preventative action" for security reasons but process must subsequently be provided).[17]

---

[17] Most of our sister circuits that have addressed administrative restrictions by jail officials have concluded that some level of due process is owed to a pretrial detainee who is subjected to such restrictions. *See Miller v. Dobier*, 634 F.3d 412, 415 (7th Cir. 2011) (observing that administrative restrictions on pretrial detainee would trigger procedural protections if resulting conditions constitute "an actionable incremental deprivation of liberty"); *Stevenson v. Carroll*, 495 F.3d 62, 70 (3d Cir. 2007) (ruling that pretrial detainees transferred to more restrictive facility are entitled to explanation and "opportunity to respond") (citing *Hewitt v. Helms*, 459 U.S. 460 (1983)); *Benjamin v. Fraser*, 264 F.3d 175, 188 (2d Cir. 2001) (affirming decision requiring ex post facto (Continued)

As a general proposition, such individualized restrictions — whether disciplinary or administrative — implicate procedural due process concerns. In some circumstances, however, the treatment of a pretrial detainee can be so disproportionate, gratuitous, or arbitrary that it becomes a categorically prohibited punishment that will sustain a substantive due process claim. *See Surprenant*, 424 F.3d at 13 (1st Cir. 2005) ("An arbitrary, or disproportionate sanction, or one that furthers no legitimate penological objective, constitutes punishment (and, thus, is proscribed by the Fourteenth Amendment).") (citing *Bell*, 441 U.S. at 538-39); *Robles v. Prince George's County*, 302 F.3d 262, 269 (4th Cir. 2002) (applying *Bell*'s substantive due process analysis to maltreatment of detainee during custody transfer). Thus, although jail officials are entitled to impose discipline and promote internal security by placing restrictions on pretrial detainees, such measures must yet be rationally related to a legitimate governmental purpose, regardless of the procedural protections provided. *See Bell*, 441 U.S. at 539; *Surprenant*, 424 F.3d at 13.[18]

procedural protections when jail placed security restrictions on pretrial detainees). *But see Martucci v. Johnson*, 944 F.2d 291, 294 (6th Cir. 1991) (deciding that pretrial detainee lacks liberty interest in type of confinement, and ruling that administrative segregation for eight days to foil escape attempt failed to trigger procedural protections).

[18] The key difference between permissible "disciplinary" restrictions and unconstitutional "punishment" is that the former are intended to advance — and are reasonably related to — "the effective management of the detention facility." *See Bell*, 441 U.S. at 540. Thus, disciplinary measures based on a pretrial detainee's misconduct in custody and proportional thereto are not "punishment" within the meaning of *Bell* and therefore are not unconstitutional. *See id*. If, however, such measures are excessive or arbitrary, they may constitute prohibited punishment. *See id.*; *see also Surprenant*, 424 (Continued)

b.

Importantly, an additional legal principle governs the treatment of pretrial detainees by jail officials: such detainees possess at least the same rights as convicted prisoners. *See Bell*, 441 U.S. at 545 ("*A fortiori*, pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners."). This settled tenet provides further guidance to jail officials concerning the procedural rights of pretrial detainees, because the rights accorded convicted prisoners provide a floor for detainee rights. The Supreme Court's decision in *Wolff v. McDonnell* in 1974 recognized that convicted prisoners subject to disciplinary deprivations of liberty or property interests are entitled to notice, a hearing (which may involve witnesses and documentary evidence), and an explanation of the resulting decision. *See* 418 U.S. 539, 557-58, 563-65 (1974). Consequently, a jail official that seeks to discipline a pretrial detainee must provide the detainee with at least the procedural protections required by the *Wolff* decision. *See Dilworth*, 841 F.3d at 254.

A similar — but less demanding — standard governs the imposition of administrative restrictions on convicted prisoners. As the Supreme Court ruled in *Hewitt v. Helms* in 1983, if a sentenced prisoner has a viable liberty interest, he must be afforded some minimal procedural protections before being subjected to more restrictive

F.3d at 13. "Punishment" also encompasses "purposeless" restrictions "inflicted on detainees *qua* detainees." *See Bell*, 441 U.S. at 539. That second aspect of "punishment" allows detainees to challenge shared conditions of confinement that are not "reasonably related" to a permissible government objective. *See id.*; *Slade*, 407 F.3d at 251.

conditions of confinement for administrative purposes. *See* 459 U.S. at 474, 476; *see also Baker v. Lyles*, 904 F.2d 925, 930 (4th Cir. 1990) (observing that administrative segregation requires "limited due process"). That rule extends to the placement of such a prisoner in "administrative segregation," a term that generally refers to solitary confinement. *See Hewitt*, 459 U.S. at 465, 467 & n.4; *see also Davis v. Ayala*, 135 S. Ct. 2187, 2208 (2015) (Kennedy, J., concurring) (explaining that "administrative segregation" is "better known" as "solitary confinement"). In such situations, the *Hewitt* decision requires that prison officials provide a convicted prisoner "some notice of the charges against him and an opportunity to present his views" to the deciding official, although that opportunity may be provided after the fact. *See* 459 U.S. at 476. Prisoners are also entitled to periodic review of their confinement to ensure that administrative segregation is not "used as a pretext for indefinite confinement." *Id*. at 477 n.9. Those principles — as enunciated by the Supreme Court — provide a floor for the rights of pretrial detainees such as Williamson. *See Bell*, 441 U.S. at 545. That is, a pretrial detainee with a liberty interest in avoiding administrative restrictions is entitled to at least the *Hewitt* level of procedural protections. *See id*.; *Stevenson*, 495 F.3d at 70; *Benjamin*, 264 F.3d at 190.

Although the *Hewitt* principles provide a floor for the rights of pretrial detainees, the precise level of process that is due in a given situation also depends on a balancing of interests, consistent with the test identified by the Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *See Incumaa v. Stirling*, 791 F.3d 517, 533 (4th Cir. 2015) (assessing level of process provided to administratively segregated prisoner for compliance with *Hewitt*

38

and *Mathews*) (citing *Wilkinson v. Austin*, 545 U.S. 209, 228-29 (2005)).  Pursuant to the *Mathews* principles, a reviewing court must weigh the private interests impacted by an official action; the risk of "an erroneous deprivation of such interest through the procedures used, and the probable value, if any," of additional safeguards; plus the Government's opposing interests.  424 U.S. at 335.  Thus, a court evaluating a pretrial detainee's procedural due process claim concerning an administrative restriction must decide whether the procedures provided to the detainee comply with *Hewitt* and satisfy the *Mathews* test.  *See Incumaa*, 791 F.3d at 535.  With those settled principles in mind, we turn to the merits of Williamson's due process claims against Director Stirling and Sheriff Carroll.

C.

The district court — adopting the Magistrate Report — awarded Director Stirling and Sheriff Carroll summary judgment on the grounds that Williamson could not prove his due process claims and that, if he could, they were nevertheless entitled to qualified immunity.  In making those determinations, however, the court did not correctly analyze the due process claims or view the record in the proper light.

Courts are obliged to view the evidence in the light most favorable to the nonmoving party when awarding summary judgment and in conducting a qualified immunity analysis.  *See Meyers v. Baltimore County*, 713 F.3d 723, 730 (4th Cir. 2013).  A proper analysis of Williamson's due process claims reveals genuine issues of material fact that undermine the summary judgment awards made to Director Stirling and Sheriff Carroll.  Because those factual questions also impact whether Stirling and Carroll are

39

entitled to qualified immunity, we will first evaluate the due process claims. *See, e.g.*, *Vathekan v. Prince George's County*, 154 F.3d 173, 179-80 (4th Cir. 1998) (explaining that "summary judgment on qualified immunity grounds is improper" if there "remains any material factual dispute regarding the actual conduct of the defendants" and affecting applicability of immunity award) (internal quotation marks omitted). We will then assess whether the district court nevertheless properly awarded Stirling and Carroll qualified immunity on the ground that a reasonable official would not have known that his actions contravened clearly established constitutional principles at the time of the challenged conduct. *See Meyers*, 713 F.3d at 730-31, 734 (assessing whether officer merited qualified immunity award if disputed facts were resolved in plaintiff's favor).

1.

To properly assess Williamson's substantive due process claim, we must determine whether he has been punished in contravention of *Bell* and the Due Process Clause. In making that assessment, we accept the evidence in the light most favorable to him. *See Glynn*, 710 F.3d at 213. More specifically, we must determine whether the evidence shows that Williamson's pretrial detention in solitary confinement for three-and-a-half years was punitive, and thus unconstitutional. Because Williamson has demonstrated a genuine issue of material fact in that regard, his substantive due process claim must be resolved by a jury of his peers.

As previously explained, to prevail on a substantive due process claim, a pretrial detainee must show unconstitutional punishment by proving that the challenged conditions were either "(1) imposed with an expressed intent to punish or (2) not

40

reasonably related to a legitimate nonpunitive governmental objective, in which case an intent to punish may be inferred." *Slade*, 407 F.3d at 251 (quoting *Martin*, 849 F.2d at 870). Thus, absent an explicit intention to punish a pretrial detainee, we must evaluate the evidence and ascertain the relationship between the actions taken against the detainee and the custodian's supporting rationale. *See id*. That inquiry turns on whether the actions taken may validly be attributed to an alternative, nonpunitive rationale, and whether they appear "excessive in relation to the alternative purpose assigned." *Robles*, 302 F.3d at 269 (quoting *Bell*, 441 U.S. at 538).

Williamson does not argue that the record proves an express punitive intent as to Stirling and Carroll. He instead contends that the punitive nature of his extended period of solitary confinement is readily inferred and that a jury would so find. Specifically, he argues that his conditions of confinement were not reasonably related to any legitimate, nonpunitive governmental objective and were patently excessive in light of the perpetrators' only stated purpose — preventing Williamson from carrying out the threats made in his 2013 letter. Williamson argues that, in these circumstances, he has shown a genuine issue of material fact on the substantive due process claim as to whether he was being punished, and that summary judgment was thus not warranted. Director Stirling and Sheriff Carroll respond by arguing that protecting the targets of Williamson's threats constituted a legitimate, nonpunitive basis for his prolonged conditions of solitary confinement.

After considering those contentions, the Magistrate Report accepted the defendants' asserted purpose for Williamson's three-and-a-half years of solitary

41

confinement as "an unrefuted nonpunitive government objective that precludes a reasonable inference of punitive intent." *See* Magistrate Report 6. That uncritical acceptance of the defendants' only justification for such a prolonged period of solitary confinement failed to evaluate the relationship between the supporting rationale and the conditions imposed. A court weighing a pretrial detainee's substantive due process claim must meaningfully consider whether the conditions of confinement were "reasonably related" to the stated objective, or whether they were "excessive" in relation thereto. *See Bell*, 441 U.S. at 537-39, 539 n.20; *Slade*, 407 F.3d at 251. Additionally, a court sitting in summary judgment must always accept the facts in the light most favorable to the nonmoving party. *See Glynn*, 710 F.3d at 213.

According meaningful consideration to the inquiries identified by the Supreme Court in *Bell*, and accepting the facts in the proper light, Williamson has shown that a genuine issue of material fact exists as to whether his treatment as a pretrial safekeeper actually amounted to punishment that was unconstitutional under *Bell*. More specifically, the evidence would support a jury finding that his extended period of solitary confinement was not attributable to a nonpunitive rationale, or that it was excessive in relation to that purpose. *See Robles*, 302 F.3d at 269.

Most strikingly, Williamson was placed in solitary confinement — restricted to his cell twenty-three hours a day, with minimal access to books, phones, or any human contact — for more than three years, because of a single incident of unrealized and unrepeated threats. A reasonable jury could readily find such a response to be excessive — and thus punitive — in relation to the State's interest in preventing Williamson from

42

carrying out the threats. *See Covino v. Vt. Dep't of Corr.*, 933 F.2d 128, 130 (2d Cir. 1991) (remanding to assess whether nine-month administrative detention violated due process and observing that such duration "smacks of punishment"). And there is no evidence that Williamson actually sought to carry out his threats, or that he ever repeated them. In such circumstances, a security justification for placing Williamson in solitary confinement for three-and-a-half years is difficult to discern. *See Bell*, 441 U.S. at 538-39; *Robles*, 302 F.3d at 269-70 (ruling that tying detainee to pole in parking lot served no purpose in custody transfer and therefore constituted punishment).

Director Stirling and Sheriff Carroll admit that Williamson's continuing safekeeper status was predicated solely on his November 2013 letter. And the record shows no additional infractions or threats during the time Williamson was in SCDC custody. A jury could decide that this lack of subsequent misconduct undermines the proffered rationale for Williamson's period of solitary confinement for two good reasons. First, it would support a jury finding that three-and-a-half years of solitary confinement was excessive for an isolated incident, and was therefore punitive within the meaning of *Bell*. Second, Williamson's good behavior casts substantial doubt on the propriety of the renewals of his safekeeper status. Pursuant to the Executive Order, such safekeeper orders could only be renewed "upon a showing of good cause and/or no material change in circumstances." Although an improved disciplinary record could obviously be a material change in circumstances, it was not a change that was ever considered.

The record fails to shed any further light on the decisionmaking process underlying the multitude of renewals of Williamson's safekeeper status. Although

43

Sheriff Carroll may have offered Director Stirling some asserted "good cause" for Williamson's continued detention — as required by the Executive Order — the district court lacked documentation to support Stirling's renewal recommendations. And Stirling's memoranda — at least those of record — were perfunctory, containing the same boilerplate language over three-and-a-half years. *See, e.g.*, J.A. 552, 556. None even mentions Williamson's improved disciplinary record.

Nor did Director Stirling ever address Williamson's worsening mental health symptoms — a striking omission in view of the exclusion of mentally-ill pretrial detainees from South Carolina's safekeeper program. Put simply, the fact that Williamson's safekeeper status and his solitary confinement conditions remained unchanged, despite demonstrable differences in his circumstances, leads to an inference of rote renewals. Such "rubber-stamp[ing]" not only ignores the mandates of the Executive Order, it constitutes compelling evidence of "arbitrary decisionmaking." *See Incumaa*, 791 F.3d at 534. Such flawed decisions, in turn, would undermine the claim that Williamson's prolonged conditions of solitary confinement were "reasonably" related to some supporting rationale. *See Robles*, 302 F.3d at 269; *see also Surprenant*, 424 F.3d at 13.

Finally, the fact that no other discipline was ever imposed for Williamson's actions in November 2013 provides compelling support for a finding that his safekeeper status was actually punishment for those actions. *See Magluta v. Samples*, 375 F.3d 1269, 1275 (11th Cir. 2004) (explaining that allegations of retaliatory intent on part of jail officials justified inference that detainee's placement in solitary confinement was

44

punitive). In these circumstances, Williamson has presented sufficient evidence to undermine the rationale relied on for his prolonged conditions of solitary confinement. And that evidence creates issues of material fact as to the purpose and proportionality of such confinement.

Seeking to avoid this problem on appeal, Director Stirling and Sheriff Carroll argue that the *Bell* inquiry (whether the conditions of confinement were reasonably related to a nonpunitive purpose) applies only to Williamson's initial transfer to safekeeper status in November 2013. That is, they urge us to examine only whether Williamson's initial designation as a safekeeper was reasonably related to the security concerns raised by his threatening letter. Stirling and Carroll thus contend that the conditions of solitary confinement reimposed on Williamson approximately thirteen times for three-and-a-half years should be disregarded. That constrained approach, however, is not required by logic or precedent.

The *Bell* decision explicitly instructs the courts facing such issues to ask whether "the conditions and restrictions" placed on pretrial detainees "amount to punishment." *See* 441 U.S. at 536-37. *Bell* also requires those courts to weigh the proportionality of those conditions and to assess whether they constitute "an affirmative disability or restraint," whether they have "historically been regarded as a punishment," or whether they promote "the traditional aims of punishment — retribution and deterrence." *Id*. at 538. Importantly, the *Bell* Court expressly considered, inter alia, the duration of the punitive conditions. *Id*. at 543. Thus, *Bell*'s analysis broadly encompasses the circumstances of all restraints placed on a pretrial detainee, not merely the decision to

45

impose them. And the courts of appeals have consistently adhered to *Bell*'s guidance. *See Dilworth*, 841 F.3d at 253 (4th Cir. 2016) (invoking duration of solitary confinement); *Hubbard v. Taylor*, 399 F.3d 150, 159-60 (3d Cir. 2005) (evaluating "totality of circumstances" in assessing whether pretrial conditions amounted to punishment); *Lock v. Jenkins*, 641 F.2d 488, 491-94 (7th Cir. 1981) (assessing cumulatively conditions of confinement imposed on pretrial "safekeepers," including duration); *Campbell v. Cauthron*, 623 F.2d 503, 507 (8th Cir. 1980) (evaluating conditions imposed on pretrial detainees and period of time during which they were confined). As the logic of *Bell* demonstrates, the district court should also have emphasized the prolonged duration of Williamson's solitary confinement — constituting fifteen percent of his lifetime — in evaluating the "particular restrictions and conditions accompanying [his] pretrial detention." *See Bell*, 441 U.S. at 538.

In sum, viewing the evidence in the proper light and making reasonable inferences favorable to Williamson, he has demonstrated that the summary judgment awards to Stirling and Carroll were not warranted as to his substantive due process claim. More specifically, he has presented evidence on which a reasonable factfinder could conclude that his three-and-a-half years of solitary confinement were so excessive relative to his infractions — and the defendants so arbitrary in their actions — that Williamson suffered unconstitutional punishment in violation of his substantive due process rights.[19]

---

[19] The defendants have submitted supplemental authorities and argued that Williamson's guilty plea in Barnwell County in early 2018 constitutes a bar to any claim that he was punished without due process. Those authorities, however, are not (Continued)

46

2.

Turning to Williamson's procedural due process claim, we must decide whether his detention in solitary confinement as a safekeeper "implicated a liberty interest triggering procedural due process requirements; and, if so, whether the procedures" afforded him "satisfied those requirements." *See Dilworth*, 841 F.3d at 250-51. The answers to those inquiries depend on the nature and purpose of the solitary confinement, namely, whether it was "disciplinary" or "administrative." In either circumstance, however, we are satisfied that Williamson's pretrial detention in solitary confinement implicated a liberty interest that entitled him to a level of procedural protections.

a.

We have recently recognized that pretrial detainees "retain a liberty interest in freedom from 'punishment,'" so that "discrete 'punitive measures' imposed during pretrial detention intrude on a protected liberty interest." *See Dilworth*, 841 F.3d at 251 (quoting *Bell*, 441 U.S. at 535-37); *see also Martin*, 849 F.2d at 870 (explaining that *Bell* and Due Process Clause protect pretrial detainees from "*any* form of 'punishment'"). That principle extends to disciplinary measures stemming from a pretrial detainee's misconduct while in custody. *See Dilworth*, 841 F.3d at 253. That is, although such disciplinary measures are not necessarily "punishment" within the meaning of *Bell* — insofar as they may be reasonably related to "the effective management" of the jail —

_____

controlling and are legally and factually inapposite. We therefore reject that supplemental contention.

47

such measures nevertheless implicate a pretrial detainee's liberty interest in remaining free from punishment and thus trigger procedural protections.  *See Bell*, 441 U.S. at 540; *Dilworth*, 841 F.3d at 253.[20]

In short, although jail officials are entitled to place restrictions on pretrial detainees for misconduct committed during their detention, those regulatory types of discipline nevertheless intrude on the detainee's liberty interest in remaining free from punishment.  Accordingly, a pretrial detainee may not be disciplined in the absence of some level of due process.  *See Bell*, 441 U.S. at 535; *Dilworth*, 841 F.3d at 251, 252.  To determine whether a particular restriction is disciplinary — rather than administrative — the courts again consult the framework of *Bell*, which guides that inquiry for procedural as well as substantive due process claims.  Such courts must ask whether the restriction is expressly punitive, or whether a punitive intent may be inferred because the restriction is

---

[20] Every court of appeals that has considered whether pretrial detainees possess a liberty interest in being free from punishment has agreed that they do.  Those circuits have further ruled that such a liberty interest triggers procedural protections for pretrial detainees who are subjected to disciplinary measures.  *See Jacoby*, 835 F.3d at 1349 (11th Cir. 2016) (collecting decisions and concluding that "*Bell* creates a [procedural] due process right for pretrial detainees who are subject to punishment"); *Stevenson*, 495 F.3d at 69-71 (3d Cir. 2007) (discussing pretrial detainees' liberty interest in being free from punishment); *Surprenant*, 424 F.3d at 16-17 (1st Cir. 2005) (ruling that pretrial detainees "have a liberty interest in avoiding punishment," which "derives from the Constitution itself"); *Benjamin*, 264 F.3d at 188-90 (2d Cir. 2001) (deciding that security measures "tantamount to punishment" implicate liberty interest); *Rapier v. Harris*, 172 F.3d 999, 1005 (7th Cir. 1999) (explaining that punishment of pretrial detainees triggers "procedural protections"); *Mitchell*, 75 F.3d at 524 (9th Cir. 1996) (concluding that pretrial detainees retain "liberty interest in not being punished without due process").

not reasonably related to a legitimate, nonpunitive purpose. *See Dilworth*, 841 F.3d at 252-53 (invoking *Bell* to analyze the nature of detainee's placement in segregation).[21]

As explained heretofore, a triable issue is presented here concerning whether Williamson's prolonged placement in solitary confinement constituted punishment under *Bell*. That issue also bears on whether Williamson's extended period of solitary confinement was "disciplinary" — rather than "administrative" — and thus whether it intruded on his liberty interest in remaining free from punishment. *See Dilworth*, 841 F.3d at 253. Such disciplinary measures trigger the procedural protections recognized in the Court's 1974 *Wolff v. McDonnell* decision: that is, notice, a hearing, and a written explanation of the resulting decision. *See id.* (citing *Wolff*, 418 U.S. at 557-58, 563-65). Accordingly, if Williamson's conditions of solitary confinement were imposed for a disciplinary purpose, the responsible officials intruded on his liberty interest in being free

---

[21] The other courts of appeals to have addressed the distinction between "disciplinary" and "administrative" measures imposed on pretrial detainees have likewise consulted *Bell*. *See Jacoby*, 835 F.3d at 1348 n.5 ("As with a substantive due process claim, whether a condition of pretrial detention amounts to punishment turns on whether the condition is imposed for the purpose of punishment" or is "incident to some legitimate government purpose") (internal quotation marks omitted); *Stevenson*, 495 F.3d at 69 (acknowledging that "allegations of punishment" may be "coextensive with the allegations that form the basis for the procedural due process claim"); *Benjamin*, 264 F.3d at 188-90 (applying *Bell*'s indicators of punishment in ascertaining level of process to be accorded pretrial detainees); *Fuentes v. Wagner*, 206 F.3d 335, 341-42 (3d Cir. 2000) (assessing procedural due process claim by determining whether pretrial detainee was punished within meaning of *Bell*); *Rapier*, 172 F.3d at 1005 (invoking *Bell* to distinguish between disciplinary and administrative measures taken against pretrial detainees).

from punishment. In that event, Williamson was owed the level of process established by *Wolff*.

b.

If, on the other hand, Williamson was in solitary confinement for more than three years for "administrative" reasons, the question is whether, as a pretrial detainee, he nevertheless possessed a liberty interest in avoiding "administrative segregation." As explained below, Williamson possessed such a liberty interest.

This issue is somewhat complex and our sister circuits seem to have approached it from different perspectives. Some circuits have ruled that pretrial detainees possess a liberty interest in being free from indefinite or prolonged administrative segregation. *See Miller*, 634 F.3d at 415 (7th Cir. 2011) (concluding that pretrial detainees cannot be held in indefinite administrative segregation absent procedural safeguards); *Stevenson*, 495 F.3d at 69 (3d Cir. 2007) (determining that pretrial detainees "have a liberty interest in not being detained indefinitely" in restrictive facilities "without explanation or review"). Another group of circuits has suggested that the liberty interest identified in *Bell* — remaining free from punishment — triggers some minimal procedural protections for administrative actions that further restrict a pretrial detainee's liberty. *See Benjamin*, 264 F.3d at 190 (2d Cir. 2001) (explaining that "administrative" restraints trigger procedural protections); *Mitchell*, 75 F.3d at 524 (9th Cir. 1996) (suggesting that pretrial detainees merit hearings before "they are restrained for reasons other than to assure their appearance at trial"); *see also Martinez*, 977 F.2d at 423 (8th Cir. 1992) (preserving pretrial detainee's procedural due process claim because administrative segregation "is

50

punishment"). A third group of the courts of appeals — addressing short-term periods of confinement — have concluded that pretrial detainees do not have a liberty interest in avoiding limited administrative restrictions. *See Hall v. Ramsey County*, 801 F.3d 912, 920 (8th Cir. 2015) (discerning no liberty interest in avoiding two-hour seclusion); *Higgs v. Carver*, 286 F.3d 437, 438 (7th Cir. 2002) (identifying no liberty interest in avoiding thirty-four-day administrative detention); *Martucci*, 944 F.2d at 294 (6th Cir. 1991) (concluding that state law created no liberty interest in avoiding eight-day detention to foil escape attempt).

We are satisfied, however, to rely on the *Bell* decision and the Supreme Court's subsequent rulings explaining the level of process owed to convicted prisoners. As explained heretofore, the rights accorded convicted prisoners provide a floor for detainee rights. *See Bell*, 441 U.S. at 545. And Supreme Court precedent establishes that convicted prisoners possess some procedural due process rights with respect to administrative segregation. In 1983 in *Hewitt v. Helms*, the Court explained that — if a convicted prisoner has demonstrated a viable liberty interest — he merits "some notice of the charges against him and an opportunity to present his views" regarding his administrative segregation. *See* 459 U.S. at 467-68. The opportunity to present his views can be provided after the detention begins, but must take place "within a reasonable time." *See Hewitt*, 459 U.S. at 477. Prisoners must also receive periodic reviews of their detentions to ensure that administrative segregation is not "used as a pretext for indefinite [solitary] confinement." *Id*. at 477 n.9. Moreover, those periodic reviews must be meaningful enough to take into account the "facts relating to a particular prisoner." *Id*.

51

The procedural protections afforded convicted prisoners inform the minimum standards for procedures that accompany the administrative segregation of pretrial detainees. *See Bell*, 441 U.S. at 545. Although the *Hewitt* decision conditioned those protections on the prisoner's ability to show a liberty interest, that principle does not pose an obstacle to pretrial detainees such as Williamson. As *Hewitt* made clear, a prisoner's conviction and subsequent incarceration deprive him of all but "the most basic liberty interests." *See* 459 U.S. 467; *see also Sandin*, 515 U.S. at 485 (emphasizing that "lawful incarceration" incurs "withdrawal or limitation" of many constitutional rights). That surrender of rights led the Court to rule that a convicted prisoner does not have a liberty interest in avoiding restrictive conditions unless the circumstances represent an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *See Sandin*, 515 U.S. at 484; *see also Wilkinson*, 545 U.S. at 223-24.

Such a rationale for limitations on prisoner rights, however, does not apply to a pretrial detainee such as Williamson. *See Dilworth*, 841 F.3d at 251-52. Our Court and every circuit to assess the question has rejected the application of *Sandin*'s "atypical and significant hardship" test to pretrial detainees, whom *Sandin* itself distinguished from convicted prisoners. *See Sandin*, 515 U.S. at 484; *Jacoby*, 835 F.3d at 1347-48 (collecting decisions); *Dilworth*, 841 F.3d at 251-52.

On the other hand, it is clear that a pretrial detainee must yield some of his rights in order for the authorities to effectively manage detention facilities. *See Bell*, 441 U.S. at 540. Prior to conviction, however, a pretrial detainee's liberty interests do not categorically yield to the managerial interest of the jail authorities. The *Bell* decision

52

even acknowledged the "operational concerns" that inhere in the effective administration of jails, but Justice Rehnquist, in his majority opinion, did not suggest that those concerns should necessarily prevail over a detainee's liberty interests. *Id*. at 539-40. We are therefore satisfied that a pretrial detainee — such as Williamson — has a liberty interest in avoiding the harsh conditions of solitary confinement, and that a detainee confined for administrative purposes is entitled to at least the procedural protections mandated by *Hewitt*.

Over many years, going back to the nineteenth century, our society has learned much about the physical and mental health impacts of solitary confinement. *See Davis*, 135 S. Ct. at 2208-10 (Kennedy, J., concurring); *see generally* Br. of Amicus Curiae. Imposing such significant hardships on individuals not yet adjudged guilty of an offense without any procedural protections offends the principles that are "implicit in the word 'liberty.'" *See Wilkinson*, 545 U.S. at 221. In order to ensure that solitary confinement is not imposed on a pretrial detainee as punishment, in contravention of *Bell* — or indefinitely, in contravention of the accumulated precedents — we require that such detainees be accorded some level of due process, consistent with the protections specified in *Hewitt*.[22] Absent a right to such process, administrative segregation could become "a pretext" — as may have occurred here. *See Hewitt*, 459 U.S. at 477 n.9.

---

[22] The principle that pretrial detainees and prisoners may not be indefinitely detained in administrative segregation absent meaningful procedural protections is well-supported by the relevant precedent. *See Wilkinson*, 545 U.S. at 224; *Hewitt*, 459 U.S. at 477 n.9; *Incumaa*, 791 F.3d at 530-31; *Wilkerson v. Goodwin*, 774 F.3d 845, 856-57 (5th Cir. 2014); *Miller*, 634 F.3d at 415; *Stevenson*, 495 F.3d at 69.

53

Lastly, according the minimal protections outlined in *Hewitt* to pretrial detainees will not adversely impact the orderly administration of detention facilities. As we have recognized, correctional officers are entitled to take "immediate preventative action to segregate a detainee" for security reasons, or pending a disciplinary hearing. *Dilworth*, 841 F.3d at 255 (citing *Hewitt*, 459 U.S. at 463-65, 473-74). Such officials must, however — consistent with *Hewitt* — provide the pretrial detainee with at least an "informal, nonadversary review of the information" supporting segregation, including submissions from the detainee, "within a reasonable time after confining him to administrative segregation." *Hewitt*, 459 U.S. at 472.[23] We are satisfied that such procedures strike an appropriate balance between the pretrial detainee's interests, governmental interests, and the value of procedural safeguards. *See id.* at 473 (citing *Mathews*, 424 U.S. at 335); *see also Incumaa*, 791 F.3d at 533-34.

c.

A determination as to whether Director Stirling and Sheriff Carroll actually contravened Williamson's substantive and procedural due process rights must await potential discovery and trial in the district court. As we recognize today, however, Williamson is entitled to a trial on his due process claims.

---

[23] Because the *Hewitt* decision only requires that review of a pretrial detainee's administrative restrictions be provided "within a reasonable time," a temporary restriction could be of such short duration that the detainee is released before a review can be conducted. *See Hewitt*, 459 U.S. at 472; *see also, e.g.*, *Hall*, 801 F.3d at 920 (ruling that no procedural protections were required in connection with two-hour seclusion). We are not, however, called upon to determine the contours of such an exception.

With regard to his substantive due process claim, the evidence creates a genuine issue of material fact as to whether Williamson's prolonged period in solitary confinement constituted punishment under *Bell*. The resolution of that issue turns on the inquiry outlined in *Bell*, that is, whether Williamson's time in solitary confinement was rationally related to a legitimate, nonpunitive government purpose, or whether it was excessive in relation thereto. *See Bell*, 441 U.S. at 537-39. Such a rational and proportionate relationship does not exist if Williamson's conditions of confinement were "arbitrary or purposeless." *Id*. at 539.[24]

On his procedural due process claim, Williamson similarly has a triable issue concerning the purpose of his solitary confinement. Specifically, a jury must determine whether that confinement was disciplinary or administrative. That determination will delineate whether Williamson was owed the *Wolff* level of process generally applicable to disciplinary measures, or — at minimum — the *Hewitt* level of process that provides the floor for procedures that accompany a pretrial detainee's administrative segregation. The *Bell* inquiry — whether the conditions imposed on a pretrial detainee are rationally and proportionally related to a nonpunitive purpose — should also guide this determination.

---

[24] We observe that *Bell* identifies several additional factors that might indicate that a condition or restriction imposed on a pretrial detainee amounts to punishment, and which could provide guidance for a jury. In support of the inquiry examining the relationship between the condition imposed and its purported rationale, the *Bell* Court considered, inter alia: whether the conditions constituted "an affirmative disability or restraint," whether they have "historically been regarded as a punishment," whether they promote "the traditional aims of punishment," such as retribution and deterrence, and the conditions of detention viewed as a whole, including the duration for which they were imposed. *See* 441 U.S. at 536-38, 543.

55

*See, e.g.*, *Stevenson*, 495 F.3d at 69; *Rapier*, 172 F.3d at 1005.[25] We leave to the remand proceedings the determination of whether the level of process that Williamson was provided satisfies the *Mathews* principles and, as applicable, the minimum procedural protections established by *Wolff* or *Hewitt*. *See Incumaa*, 791 F.3d at 535.

3.

As the foregoing discussion demonstrates, Williamson may be able to prove to a jury that Director Stirling and Sheriff Carroll violated his substantive and procedural due process rights. That ruling, however, does not entirely resolve this appeal. Stirling and Carroll are entitled to qualified immunity from the trial itself and from liability on those claims if — as the district court ruled — "a reasonable person in [the defendants'] position could have failed to appreciate that his conduct would violate [Williamson's] rights." *See Meyers*, 713 F.3d at 734 (internal quotation marks omitted).

---

[25] As explained herein, *Bell* established the relevant inquiry for identifying "punitive" actions that contravene the substantive due process rights of pretrial detainees. It also guides the distinction between "disciplinary" and "administrative" actions taken against such detainees for purposes of procedural due process. Accordingly, where — as here — the allegations underlying the due process claims are "coextensive," a determination that a restriction is "punitive" may also confirm that the restriction was "disciplinary." *See Stevenson*, 495 F.3d at 69. Nevertheless, we recognize that the two claims are distinct, and preserve the possibility that, for example, a jail official might have provided sufficient process in connection with a disciplinary measure to avoid liability on a procedural due process claim, while the discipline itself was so excessive or arbitrary that the detainee could yet prevail on a substantive due process claim. *See Surprenant*, 424 F.3d at 13. Importantly, the *Bell* factors could also show that a restriction imposed on a pretrial detainee was "disciplinary" but — if it was reasonably related and proportional to the detainee's misconduct during detention — that restriction would not be "punitive" for purposes of a substantive due process claim. *See Bell*, 441 U.S. at 540.

An award of qualified immunity protects a government official from civil liability and suit "insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome a defendant's claim of qualified immunity, the court must determine: "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). Pursuant to the Supreme Court's explanation in *Pearson v. Callahan*, those inquiries need not be addressed in sequence; instead, courts are entitled to "exercise their sound discretion" and decide which issue to first address. *See* 555 U.S. 223, 236 (2009). The defendant official is entitled to qualified immunity if either prong is not satisfied. *See id.* at 244-45; *Meyers*, 713 F.3d at 731.

The foregoing analysis of whether Director Stirling and Sheriff Carroll are entitled to summary judgment on Williamson's due process claims significantly answers the first prong of the qualified immunity analysis, in that it identifies the potential constitutional violations. In light of the legal and factual issues presented by the first qualified immunity prong — whether a constitutional right was violated — we have exercised our "sound discretion" and assessed that prong in our summary judgment analysis. *See Pearson*, 555 U.S. at 236. That determination, however, does not resolve the qualified immunity issue. That is, Director Stirling and Sheriff Carroll are yet entitled to qualified immunity if, under the second prong of the applicable test, Williamson's due process rights were not "clearly established at the time of the challenged conduct." *See al-Kidd*,

57

563 U.S. at 735; *see also Pearson*, 555 U.S. at 245. In making its qualified immunity rulings, the district court relied solely on the clearly established prong, deciding that Williamson's due process rights were not clearly established, and thus awarded qualified immunity to Stirling and Carroll. We must determine whether the court was correct on that issue, which we review de novo. *See Adams*, 884 F.3d at 226.

Under our precedent, clearly established law encompasses "not only 'specifically adjudicated rights,' but also 'those manifestly included within more general applications of the core constitutional principles invoked.'" *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) (quoting *Wall v. Wade*, 741 F.3d 492, 502-03 (4th Cir. 2014) (quoting *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992))). Public officials "'can still be on notice that their conduct violates established law even in novel factual circumstances,' so long as the law provided 'fair warning'" that their conduct was wrongful. *Id.* (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). "[O]rdinarily" we "need not look any further" than our own decisions and those of the Supreme Court. *Id.* In some circumstances, however, we can examine rulings of "the highest court of the state in which the case arose." *Id.* And in the absence of any such authorities, "we may look to a consensus of cases of persuasive authority from other jurisdictions." *Id.* (internal quotation marks omitted).

a.

With respect to Williamson's substantive due process claim, it is clear that Director Stirling and Sheriff Carroll are not entitled to qualified immunity. It has been clearly established since at least 1979 that pretrial detainees are not to be punished. *See*

58

*Bell*, 441 U.S. at 535, 539; *Robles*, 302 F.3d at 269. If a jury finds that Williamson's prolonged conditions of solitary confinement constituted punishment within the meaning of *Bell*, Stirling and Carroll have violated that substantive due process right. The district court will therefore have erred, and qualified immunity was inappropriately awarded on that claim. *See Meyers*, 713 F.3d at 731.

b.

Turning to Williamson's procedural due process claim, we must again distinguish between claims arising from disciplinary sanctions and claims arising from administrative restrictions. That distinction also turns on the nature of Williamson's confinement, that is, the issue of whether his confinement was "disciplinary" or "administrative." If the law regarding the level of process owed to pretrial detainees was not clearly established as to either situation, Director Stirling and Sheriff Carroll would yet be entitled to qualified immunity on Williamson's procedural due process claim. *See Pearson*, 555 U.S. at 244-45; *Meyers*, 713 F.3d at 731. Accordingly, we must assess whether, at the time of the defendants' conduct, the law was clearly established on the level of process owed to a pretrial detainee who was subjected to disciplinary restrictions, or, in the alternative, to administrative restrictions.

(1)

If Williamson's prolonged conditions of solitary confinement were imposed as a disciplinary measure, it was clearly established that he was entitled to the notice and hearing mandated by the Court's 1974 decision in *Wolff*. We explicitly ruled as much two years ago in *Dilworth* (during Williamson's solitary confinement). But we need not

59

have spoken to the precise issue presented if the law already provided "fair warning" that the challenged conduct was unconstitutional. *See Booker*, 855 F.3d at 538 (quoting *Hope*, 536 U.S. at 741).

With respect to disciplinary restrictions, by November 2013, Williamson's right to the procedural protections of *Wolff* was "manifestly included within more general applications of the core constitutional principles" at stake. *See id.* Specifically, the *Wolff* level of process owed to prisoners — notice, a hearing, and a written decision — provided a floor for the procedural rights due to Williamson as a pretrial detainee, as specified in the *Bell* decision. Moreover, every court of appeals to address the question had ruled that pretrial detainees are entitled to the *Wolff* level of process in connection with disciplinary restrictions. *See Stevenson*, 495 F.3d at 70-71 (3d Cir. 2007) (confirming that pretrial detainees subject to disciplinary restrictions are entitled to *Wolff* procedures); *Surprenant*, 424 F.3d at 17 (1st Cir. 2005) (same); *Benjamin*, 264 F.3d at 190 (2d Cir. 2001) (same); *Rapier*, 172 F.3d at 1005-06 (7th Cir. 1999) (same); *Mitchell*, 75 F.3d at 524-25 (9th Cir. 1996) (same). Those decisions show a clear consensus of persuasive authority applying the rule derived from *Wolff* and *Bell*. *See Booker*, 855 F.3d at 538. In short, when Williamson was placed in safekeeper status in 2013, no "reasonable official" could have believed that a pretrial detainee could be disciplined absent the level of due process required by *Wolff*. *See al-Kidd*, 563 U.S. at 741.

(2)

If Williamson's prolonged period of solitary confinement was of an administrative nature, a separate question arises as to whether the level of process to which he was

entitled was clearly established during such confinement. The combined force of *Bell* and *Hewitt* strongly suggests, however, that pretrial detainees subjected to administrative segregation merited at least the minimal level of process established by *Hewitt* in 1983. Moreover, in 2005, the Supreme Court ruled in its *Wilkinson* decision that convicted prisoners possessed a liberty interest in avoiding administrative assignment to a state "supermax" prison, based in part on the extreme isolation imposed on inmates in such a facility, under conditions that resemble Williamson's experience in several ways. *See* 545 U.S. at 223-24. That said, a pretrial detainee's liberty interest in avoiding administrative segregation — clearly defined today — conceivably remained within the realm of reasonable debate in 2013, given the lack of direct rulings on the issue, the somewhat conditional terms of the *Hewitt* decision, and the distinct factors at play in the *Wilkinson* decision. *See al-Kidd*, 563 U.S. at 741.[26]

Nevertheless, in our *Incumaa* decision in July 2015, Judge Thacker carefully explained that convicted prisoners possess a liberty interest in avoiding solitary confinement under conditions similar to those imposed on Williamson, even when those conditions are imposed for security reasons. *See* 791 F.3d at 532 (assessing circumstances of prisoner's solitary confinement and ruling that he possessed "a liberty

---

[26] Although *Wilkinson* is an important precedent in the body of law providing the defendants with fair notice of their due process obligations to pretrial detainees, that decision alone was not sufficient notice to bar the defendants' claims of qualified immunity. Put succinctly, the *Wilkinson* Court applied a cumulative approach that relied on factors not present here, such as the parole implications of assignment to a supermax facility. *See* 545 U.S. at 224.

interest in avoiding solitary confinement in security detention"). Like Williamson, Incumaa was confined to his prison cell for nearly every hour of every day and deprived of reading materials and most human contact. *See id*. at 531. The *Incumaa* record was also fuzzy as to whether the prisoner was accorded an opportunity to secure his release from those conditions (Incumaa had been confined for twenty years, rather than three). *Id*. at 519, 532. Our panel ruled that Incumaa had "demonstrated a liberty interest in avoiding solitary confinement in security detention." *Id*. A triable issue was therefore presented as to whether the defendants had provided Incumaa with a sufficient level of process, as the record was "bereft of any evidence" that Incumaa "ever received meaningful review," which would fall "short of satisfying *Hewitt*." *Id*. at 533. Because convicted prisoners such as Incumaa possess those procedural protections, Williamson, as a pretrial detainee, is also entitled to them. *See Bell*, 441 U.S. at 545.

Thus, the *Incumaa* decision gave clear notice to jail officials in 2015 that a long-term detention in solitary confinement — even when imposed for security reasons — justifies some level of procedural protection. Nevertheless, Williamson's circumstances went unchanged for twenty-two months after the *Incumaa* decision. The responsible officials — Director Stirling and Sheriff Carroll — could not be entitled to qualified immunity on the procedural due process claim during the nearly two-year period in which they ignored that controlling precedent. Accordingly, after the July 2015 *Incumaa* decision, Stirling and Carroll are not entitled to qualified immunity from trial or liability with respect to any renewals of Williamson's solitary confinement conditions if they failed to provide him with the level of process that would at least satisfy *Hewitt*. *See*

*Wilkerson*, 774 F.3d at 857-58 (assessing prolonged detention and denying qualified immunity for decisions made after rulings that gave defendants fair notice that such detention triggered procedural protections); *West v. Murphy*, 771 F.3d 209, 214 (4th Cir. 2014) (emphasizing that "notice" is central focus in determining whether law was "clearly established"); *Kinney v. Weaver*, 367 F.3d 337, 354-55 (5th Cir. 2004) (ruling that officers could be liable for claims arising from acts "after the illegality of [the defendants'] actions [had] become clear").

(3)

Because the legal principles controlling the level of process owed to pretrial detainees were — but for a narrow exception — clearly established at the time of the defendants' relevant conduct, Stirling and Carroll are not presently entitled to qualified immunity on Williamson's procedural due process claim. By way of further explanation, however, Director Stirling and Sheriff Carroll could be entitled to qualified immunity with respect to liability for a procedural due process violation — if Williamson's confinement was "administrative" in nature — between November 2013 and July 2015. Whether that discrete exception might apply to liability depends on what a jury may find regarding the nature of Williamson's solitary confinement during that period, that is, whether it was disciplinary or administrative. We therefore leave further analysis of that question for the remand proceedings. *See Willingham v. Crooke*, 412 F.3d 553, 560 (4th Cir. 2005) (recognizing that trial court may submit factual questions to jury bearing on qualified immunity issues and thereafter determine applicability of such immunity).

We will therefore vacate the awards of qualified immunity made by the district court to Director Stirling and Sheriff Carroll on the procedural due process claim. We leave to the jury and the district court the issue of whether Williamson's solitary confinement was disciplinary or administrative. We also leave for the remand proceedings the determination of whether the level of process accorded to Williamson satisfies the legal requirements applicable to his procedural due process claim.

V.

Pursuant to the foregoing, we affirm the summary judgment awards made by the district court to defendants Charlton and Miller. On the other hand, we vacate the summary judgment awards made to defendants Stirling and Carroll, and we remand as to those defendants for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART, AND REMANDED*