

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,105

### TYRONE JAMAAL WILLIAMS, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. 31293 IN THE 196TH DISTRICT COURT
### HUNT COUNTY

KELLER, P.J., delivered the opinion of the Court in which YEARY, KEEL, SLAUGHTER and MCCLURE, JJ., joined. HERVEY, RICHARDSON, NEWELL and WALKER, JJ., concurred.

## O P I N I O N

In November 2021, Appellant was tried for and convicted of capital murder pursuant to Section 19.03(a)(7)(A) of the Texas Penal Code[1] for the murder of more than one person in the same criminal transaction. On the basis of the jury's answers to the statutorily required special issues,

---

[1] TEX. PENAL CODE § 19.03(a)(7)(A).

Appellant was sentenced to death.[2]  Direct appeal to this Court is automatic.[3]  Appellant raises four

points of error.  Finding no reversible error, we affirm the conviction and sentence.

## I. FACTUAL BACKGROUND

Nicole Gonzales was Appellant's girlfriend.  Their relationship was fraught with violence.

Several law enforcement officers testified about numerous incidents of assault perpetrated by

Appellant against Nicole.  At the time of the murders, Nicole and Appellant had two children: a one-

year-old daughter named Mya and a one-month-old daughter named Natalie.  Nicole eventually left

Appellant and took the children with her.

On June 17, 2016, Nicole, Mya, and Natalie went with Nicole's parents, Vickie and Joe

Gonzales, to eat lunch and run errands in Greenville.  After finishing their errands, Nicole returned

to her home in Commerce with Vickie and the children.  At 1:17p.m., the Hunt County Sheriff's

Department received a 911 call from a female screaming for help.  The dispatcher testified that the

female said "Tyrone" multiple times during the call.

Law enforcement's investigation revealed that the women had returned home to find that

Appellant had already broken into the house and was waiting for them.  When law enforcement

responded to the 911 call, they found both Nicole and Vickie deceased.  Both women had zip ties

around their necks, and several strands of gray duct tape were found hanging around the house.  The

women were lying in pools of blood.  They had been stabbed multiple times and their throats had

been cut. A bloody filet knife was found in a bedroom in the house.  Neither child was harmed.

During the ensuing investigation, Appellant's vehicle was located approximately three-quarters of

---

[2]  TEX. CODE CRIM. PROC. art. 37.071, § 2(b).

[3]  *Id.*, § 2(h).

a mile from the crime scene. At around 11p.m. that evening, Appellant was found walking on a railroad track, and he was arrested.

## II. GUILT/INNOCENCE

### A. Prosecutorial Disqualification[4]

In his second point of error, Appellant argues that the trial court erred in both failing to dismiss Appellant's indictment and failing to disqualify the Hunt County District Attorney's Office from representing the State in the motion to dismiss. Pre-trial, Appellant filed motions alleging the State had intruded into Appellant's attorney-client privilege. The State responds that Appellant's complaints have been forfeited, or have been inadequately briefed, or fail on the merits.

### 1. *Factual Background*

Before trial, Appellant filed a Motion to Dismiss Indictment Due to Prosecutorial Misconduct. He later filed an Amended Motion to Dismiss Indictment Due to Prosecutorial Misconduct. The amended motion alleged that the trial court issued a series of *ex parte* orders for Appellant's trial counsel to receive funding to hire expert witnesses. The orders were sealed and were not to be disclosed to anyone except the trial court or Appellant's trial counsel. The trial court also issued *ex parte* orders allowing Appellant's expert witnesses to visit Appellant at the Hunt County Jail. The orders required that the visits remain confidential and that the identity of the visitor and the purpose of the visit were not to be disclosed.

The motion alleged that Hunt County Sheriff's personnel violated the *ex parte* orders when personnel entered the identities of expert witnesses retained by Appellant's trial counsel into the

---

[4] We first address the points of error that would afford Appellant the greatest relief. *See Benavidez v. State*, 323 S.W.3d 179, 182 (Tex. Crim. App. 2010). We will address Appellant's first point of error later.

Odyssey system. The Hunt County District Attorney's Office had access to the Odyssey system and, when accessing the jail visitor logs to see who had visited Appellant, came upon the identities of the expert witnesses who had visited Appellant. The amended motion to dismiss further alleged that the District Attorney's Office acted upon this information by filing a *Lagrone*[5] motion seeking to have Appellant evaluated by a mental health professional retained by the State. Appellant sought dismissal of the indictment as a remedy for the alleged violation of the *ex parte* orders or, alternatively, preclusion of the death penalty.

Contemporaneously, Appellant filed a Limited Motion to Disqualify the Hunt County District Attorney's Office. This motion asked the trial court to issue an order "disqualifying all members of the Hunt County District Attorney's Office from further participation and involvement in the defense of Defendant's Motion to Dismiss and all ancillary related Motions." The trial court denied the motion to disqualify by written order.

The trial court held a hearing on the amended motion to dismiss the indictment. Appellant called three witnesses to testify: (1) Jacklyn Henricks, a Deputy with the Hunt County Sheriff's Office who worked in the lobby of the Hunt County Jail; (2) Tammy Seymore, a Captain with the Hunt County Sheriff's Office; and (3) Steve Lilley, the lead prosecutor assigned to Appellant's case.

Deputy Henricks testified that her duties involved taking down information from visitors at the jail. She had not been trained specifically regarding *ex parte* orders or visits by expert witnesses. She testified that she had received and read emails from the Regional Public Defenders Office about the confidential nature of the visitors. Captain Seymore testified that she oversaw jail administration. She also testified that she may have received the emails from the Regional Public

---

[5] *Lagrone v. State*, 942 S.W.2d 602 (Tex. Crim. App. 1997).

Defenders Office. But she also testified that the practice at the jail was to put the confidential visitors in the visitor log because she was under the assumption that only the jail had access to its Odyssey system.

Lilley testified that he was aware that the trial court's file contained confidential matters that he could not review, but he also said that he did not know the contents of any existing sealed court orders. Because he did not know the contents of any sealed court orders, he did not know that there were any court orders having to do with people visiting Appellant in the jail. He said his practice was to view visitor logs to see who would potentially be witnesses for a defendant at trial. Lilley acknowledged viewing the confidential information in the visitor logs, but he denied intending to violate the trial court's orders. He also admitted that he searched on Google for three names that he did not recognize on the list, and he did not notify the trial court or Appellant's trial counsel that the names of the expert witnesses were on the visitor logs. When discussing the *Lagrone* motion, Lilley testified that he filed the motion because he "had a belief that the mental health of the defendant was going to be an issue that was brought up by the defense, at least as to punishment in this case." Lilley acknowledged that, even though the defense had not filed any notices designating experts, the *Lagrone* motion said that Appellant had already been evaluated by mental health professionals. Yet, Lilley testified, he had already started work on the *Lagrone* motion prior viewing the jail visitor log and he put on evidence of a Westlaw search supporting that claim. The trial court denied the motion to dismiss by written order. The trial court later denied a re-filed version of the State's *Lagrone* motion.

**2. *Pre-Trial Motion to Dismiss the Indictment***

a. Applicable Law

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[6] "Designed to remedy any imbalance in our adversary system, the Sixth Amendment promises that an accused is entitled to defense counsel in all criminal prosecutions."[7] When confronted with a Sixth Amendment violation, a trial court must, "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant effective assistance of counsel and a fair trial."[8] Suppressing evidence and limiting cross-examination are preferred methods for neutralizing the effects of Sixth Amendment violations.[9] As the Supreme Court has explained, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though [such a constitutional] violation may have been deliberate."[10] The burden is on the defendant to prove prejudice.[11] Dismissal of an indictment is "a drastic measure only to be used in the most extraordinary circumstances."[12]

### b. Analysis

Liberally construing the record and Appellant's arguments on appeal, we understand Appellant to urge two separate theories of prejudice. First, Appellant argues that he was prejudiced

---

[6] U.S. CONST. amend. VI.

[7] *Hidalgo v. State*, 983 S.W.2d 746, 752 (Tex. Crim. App. 1999) (citing *State v. Frye*, 897 S.W.2d 324, 327 (Tex. Crim. App. 1995)).

[8] *United States v. Morrison*, 449 U.S. 361, 365 (1981); *Frye*, 897 S.W.2d at 330.

[9] *Frye*, 897 S.W.2d at 330.

[10] *Morrison*, 449 U.S. at 365.

[11] *Murphy v. State*, 112 S.W.3d 592, 603 (Tex. Crim. App. 2003).

[12] *Frye*, 897 S.W.2d at 330.

by Lilley's actions because Appellant made no further contact with a psychologist that was meeting with him prior to the alleged Sixth Amendment violation because "he could no longer be assured of confidentiality." Second, Appellant argued to the trial court that Lilley's actions allowed the State to "get our trial strategy" because knowing the names of the experts took away Appellant's "ability to strategize whether [to] use" each expert at trial.

Appellant's claim fails because he cannot show that he was prejudiced by the State's actions. The facts underlying Appellant's motion to dismiss indicate that Lilley viewed the jail visitor logs, searched on Google for three names, and later filed the *Lagrone* motion. Appellant does not argue that the State gained a tactical advantage by filing the motion. Appellant's argument that the State got his trial strategy fails because nothing required the State to wait to file the *Lagrone* motion.[13] As State's counsel argued, *Lagrone* motions are fairly common in capital cases where experts are involved. He does not argue that the State found new evidence by filing the motion. Importantly, Appellant also does not argue that the State learned anything about what the experts listed on the jail visitation logs did while visiting Appellant or what opinions they may have formed. There is nothing in the record that indicates that the State benefitted other than simply learning the names of the visiting experts. Insofar as Appellant argues that he was prejudiced because he cut off contact with Dr. Blake because he could no longer be assured of confidentiality, that argument likewise fails for two reasons. First, it was not raised at the trial court below and is not preserved for review. Second,

---

[13] A trial court must "order criminal defendants to submit to a state-sponsored psychiatric exam on future dangerousness when the defense . . . *plans to introduce* its own future dangerousness expert testimony. *Lagrone*, 942 S.W.2d at 611 (ellipses added, emphasis in original); *see also In re Medina*, 475 S.W.3d 291, 306 (Tex. Crim. App. 2015) (recognizing that *Lagrone* applies "even if a defendant *merely plans* to introduce" expert testimony) (emphasis added). Lilley testified that he was already filing a *Lagrone* motion prior to viewing the visitation logs based on conversations he had with Appellant's trial counsel.

Appellant's own statements to the trial court belie his present assertions. Appellant stated to the trial court that he was not participating in the mental health evaluation because he felt the evaluation was "not necessary." At no time did Appellant or Appellant's counsel state that he was not participating because Appellant believed that evaluation would not be confidential. The trial court's *ex parte* orders were violated at some point between the trial court signing the orders and Lilley unknowingly viewing confidential information in the visitor logs. Without deciding who is to blame for that violation, we conclude that Appellant failed to show he was prejudiced to the level warranting dismissal of the indictment.

### 3. *Pre-Trial Motion to Disqualify*

#### a. Scope

First, we examine the scope of Appellant's Limited Motion to Disqualify. As is clear in the motion, Appellant's requested relief was limited to the disqualification of the Hunt County District Attorney's Office in the defense of the motion to dismiss the indictment and motions ancillary to that motion. Insofar as Appellant contends on appeal that the trial court erred in not disqualifying the Hunt County District Attorney's Office from the *entire* case, that argument was not preserved for review.[14]

#### b. Disqualification

Addressing Appellant's arguments that the trial court erred in denying the limited motion to disqualify, Appellant fails to show how he was prejudiced by that ruling. The standard of review

---

[14] *See* TEX. R. APP. P. 33.1.

for disqualification is whether the court abused its discretion.[15]  A trial court abuses its discretion

only when the decision lies "outside the zone of reasonable disagreement."[16]  A trial court has

limited authority to disqualify an elected district attorney and her staff from the prosecution of a

criminal case.[17]  The office of a district attorney is constitutionally created and protected, and a

district attorney's authority "cannot be abridged or taken away."[18]

Before the trial court, Appellant argued that Lilley's dual role as advocate for the State and

witness to the alleged Sixth Amendment violation violated Texas Rule of Professional Conduct 3.08.

Rule 3.08 provides as follows:

> A lawyer shall not . . . continue employment as an advocate before a tribunal in a
> . . . pending adjudicatory proceeding if the lawyer knows or believes that the lawyer
> is or may be a witness necessary to establish an essential fact on behalf of the
> lawyer's client, unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony will relate solely to a matter of formality and there
> is no reason to believe that substantial evidence will be offered in
> opposition to the testimony;
>
> (3) the testimony relates to the nature and value of legal services
> rendered in the case;
>
> (4) the lawyer is a party to the action and is appearing pro se; or
>
> (5) the lawyer has promptly notified opposing counsel that the lawyer
> expects to testify in the matter and disqualification of the lawyer

---

[15] *Landers v. State*, 256 S.W.3d 295, 303 (Tex. Crim. App. 2008).

[16] *Apolinar v. State*, 155 S.W.3d 184, 186 (Tex. Crim. App. 2005).

[17] *Buntion v. State*, 482 S.W.3d 58, 76 (Tex. Crim. App. 2016).

[18] *Landers*, 256 S.W.3d at 303–04; TEX. CONST. art. V, § 21; *see also State ex rel. Eidson v. Edwards*, 793 S.W.2d 1, 4 (Tex. Crim. App. 1990).

would work substantial hardship on the client.[19]

We have explained that the "violation of a disciplinary rule does not require a reversal unless a defendant can show the disciplinary rule violation affected his substantial rights or deprived him of a fair trial."[20]

Before this Court, Appellant argues that "none of the[] exceptions" to Rule 3.08 apply and that Lilley, the State's trial prosecutor, "positioned himself as the sole witness regarding a Sixth Amendment violation." Appellant also argues that "Lilley's testimony was adverse to the State because his conduct was adverse to the cause of justice."

It is unclear if there was any impropriety in Lilley's actions because Rule 3.08 does not apply to representation during pretrial matters.[21] But we need not decide if Lilley violated Rule 3.08 because Appellant does not show how he was prejudiced by Lilley's dual role as advocate-witness during the pretrial hearing on Appellant's motion to dismiss. Importantly, Lilley's alleged violation of the professional conduct rules occurred at a pretrial hearing on a subject related to the prosecutor's duties as an officer of the court. The testimony was not before the jury—the finder of fact on the issue of guilt and punishment in Appellant's trial—but instead was before the trial judge. Appellant does not demonstrate how Lilley's dual role as witness to the alleged violation and advocate for the State prejudiced Appellant at trial. Without such an argument, Appellant's claims regarding the

---

[19] TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08(a), reprinted in TEX. GOV'T CODE, tit. 2, subtit. G app. A (TEX. STATE BAR R. art. X, § 9).

[20] *Brown v. State*, 921 S.W.2d 227, 230 (Tex. Crim. App. 1996) (citing *Pannell v. State*, 666 S.W.2d 96, 98 (Tex. Crim. App. 1984) (ethical violations are to be dealt with by means of the administrative mechanisms specially established for dealing with unethical conduct)).

[21] TEX. DISCIPLINARY R. PROF'L CONDUCT 3.08, cmt. 8.

motion to disqualify lack merit.

## B. Competency

While the title of Appellant's second point of error concerns the alleged disqualification of the Hunt County District Attorney, a lengthy portion of the second point of error is dedicated to arguing that the trial court erred in refusing to make a formal determination of competency under Article 46B.005 of the Code of Criminal Procedure. In an abundance of caution, we address this claim as well.

### 1. *Applicable Law*

Incompetency to stand trial is shown if the defendant does not have: "(1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or (2) a rational as well as factual understanding of the proceedings against the person."[22] Procedurally, a trial court employs two steps for making competency determinations before it may ultimately conclude that a defendant is incompetent to stand trial. The first step is an informal inquiry; the second step is a formal competency hearing. An informal inquiry is called for upon a "suggestion" from any credible source that the defendant may be incompetent.[23] To trigger a formal competency hearing, there must be "evidence" to "support a finding of incompetency."[24] If that requirement is met, then the trial court must order a psychiatric or psychological competency examination, and

---

[22] TEX. CODE CRIM. PRO. art. 46B.003(a).

[23] *Id.* art. 46B.004(a), (c), (c-1).

[24] *Id.* art. 46B.005(a); *see also id.* art. 46B.004(c) (there must be "some evidence from any source that would support a finding that the defendant may be incompetent to stand trial.").

absent certain exceptions, it must hold a formal competency trial.[25]

With respect to the evidentiary standard that must be met at the informal inquiry stage, a court must focus on three matters.[26] First, it must determine whether there is "some evidence" of incompetency to stand trial.[27] Second, "a trial court must consider only evidence of incompetency, and it must not weigh evidence of competency against the evidence of incompetency."[28] Third, "some evidence must be presented at the informal inquiry stage to show that a defendant's mental illness is the source of his inability to participate in his own defense."[29] "[I]t is not enough to present evidence of either a defendant's mental illness alone or his refusal to cooperate with counsel—rather, there must be some evidence indicating that the defendant's refusal to rationally engage with counsel is caused by his mental illness."[30]

### 2. *Factual Background*

The issue of Appellant's mental competency was not raised until Appellant's trial counsel filed a "Motion for Competency Evaluation" after jury selection and before Appellant's trial began. The motion alleged that Appellant's mental health had deteriorated during jury selection and that Appellant had "ceased participating in the jury selection process for the final 7-10 days." The motion further alleged that Appellant was "unable to communicate in a rational manner with his

---

[25] *Id*. arts. 46B.005(a), (b); 46B.021(b).

[26] *Boyett v. State*, 545 S.W.3d 556, 563 (Tex. Crim. App. 2018).

[27] *Id.* (quoting TEX. CODE CRIM. PRO. art. 46B.004(c)).

[28] *Id.* at 564.

[29] *Id.*

[30] *Id.* (citing *Turner v. State*, 422 S.W.3d 676, 696 (Tex. Crim. App. 2014)).

defense team . . . unable to formulate rational and reasoned responses to trial preparations and matters presented to him by his defense team . . . [and was] unable to properly assimilate information and process it to make reasoned choices and to assist his attorneys."

The trial court issued an order for Appellant to undergo a competency evaluation. Appellant declined to participate or cooperate with the competency evaluation. In a pre-trial hearing, the trial court questioned Appellant regarding the competency evaluation:

Trial Court: But, Mr. Williams, sir, are you willing to cooperate and visit with Dr. Pittman or not?

Appellant: I feel it's not necessary.

Trial Court: Okay. So the Court will take note that Mr. Williams declines to participate. And sir, why do you decline? You feel it unnecessary for what reason?

Appellant: I couldn't give you a clear - - a clear answer on that, but - - I feel it's not necessary.

Trial Court: Is it because you believe yourself to be competent?

Appellant: I guess so. It's kind of last minute, and my attorneys never mentioned anything like that to me. And it was kind of just, the Judge wants to get you checked out for - - I don't know, whatever reason. And I figure at this last - - minute deal, it just was unnecessary, sir, frankly.

The trial court then stated several observations on the record:

Trial Court: So with that, again, the Court takes note that I have attempted to have him evaluated by Dr. Pittman. I note Mr. Williams' clear and unequivocal answers to the Court's question today. I note Mr. Williams' obvious understanding of what's being asked of him and the grounds for his refusal. Again, the Court does not harbor any concerns about his competency. And I believe that frankly this was more of, we haven't done it, let's do it, kind of thing. I feel like that may be the case. And so the Court's intention is to just move along without an evaluation and not undertake any other attempts to make an evaluation.

The next day, the trial court once more questioned Appellant to evaluate his understanding of the proceedings against him. The questions explored topics ranging from the nature of the charges against Appellant, his representation, the range of punishment, and the proceedings that were occurring. Appellant's answers gave no indication of incompetency.

The trial court then questioned Appellant's trial counsel:

Trial Court: Mr. Davis, I would ask you or Mr. Miears, whoever y'all elect to answer questions just generally about Mr. Williams - - do you believe, Mr. Davis or Mr. Miears, that Mr. Williams has a rational and factual understanding of these proceedings based on your interactions with him?

Mr. Miears: Judge, looking at the factors, I do believe that he has a rational understanding of the charges against him and the potential consequences of the pending criminal proceedings.

Trial Court: Okay. Do you believe he has been able to assist with the preparation of any possible defenses?

Mr. Miears: No.

Trial Court: Okay. And can you explain to me why you believe he has been unable to assist in the preparation of any possible defenses without violating a client confidence?

* * *

Mr. Miears: So I would state that based on my complete knowledge of the file, he has Swiss cheese for a brain. His brain has holes in it throughout of white matter that is only filled with cerebral spinal fluid. He has not been able to tell us in rational terms what occurred on the date of the offense from his point of view. Things that he said as to what he thinks occurred could not have occurred. And I believe that it's related to his brain damage that he has.

Trial Court: To be clear, are you stating that you believe he lacks the memory to assist you or the ability to assist you?

Mr. Miears: Well, from what I know of what - - I believe Dr. Bigler, Dr. Snyder,

and Dr. . . . Lewine, yeah. That they're going to say that his functional ability to make decisions and to relate events is impaired. And that it's impaired to the degree that it can't be relied upon to accurately say what has occurred in the past and make decisions about the present.

Trial Court: Under the laws of the State of Texas, do you believe that your client is competent to stand trial?

Mr. Miears: In the laws of the State of Texas, I believe that he lacks the present ability to disclose to counsel pertinent facts, events, and states of mind, and that he has the inability to engage in a reasoned choice of legal strategies and options. And in that last part, engage in legal strategies and options, without getting into - - anything he said, I will say that I've been made aware of the fact that he is taking actions that would prevent us from presenting mitigating witnesses on his behalf. And that, to me, is not a reasoned rational choice, but it does play into the brain damage that he has.

Trial Court: Okay. And again, not to pin you down, Counsel, but this is of critical importance to me at this time because your client seems, to be frank, to me, to seem to have a very rational understanding of these proceedings. He can recall events from years ago when he tells me who his attorneys were, you know, again, in 2019 and maybe even early 2020. He seems to me to have a rational understanding of what he's charged with and what the possible consequences are. And so, again, the person you're describing is not the person I have experience with over these many years, and I want to make sure that I understand the difference.

Are you talking about his inability to remember, or are you talking about his inability to connect with reality? Because they are two very different things, and one of which might render him incompetent and one of which clearly does not render him incompetent.

Mr. Miears: Well, assuming they are two different things, I believe that he has an inability to rationally relate events that occurred at the time of the offense. Whether that's a result of what part of his brain isn't working, I don't know. But it's - - can he remember things that we've talked about in the past? Sometimes he can; sometimes he can't. Does he know what he's charged with? Does he know the roles of the people in the courtroom? I've gone over that enough to know that I think that the answer to those questions are yes.

If you try to have conversations with him about legal strategies and options and what occurred, you don't get anywhere and you talk in circles. He doesn't seem to understand that what he's saying does not make sense. He doesn't seem to understand that what he's saying is not rational and that it could not have occurred that way.

That's just my personal opinion. I don't know if that answers the Court's question or not.

After the hearing, Appellant once more refused to participate in a competency evaluation.

The following day, the issue of competency was revisited a third time. Appellant's trial counsel once more moved for a formal competency hearing. The State argued that the issue of competency had not adequately been raised and that Appellant's own answers and statements indicated he was competent. The trial court agreed with the State, noting the following:

Trial Court: The Court is going to find that there's no evidence before the Court that would require me to inquire further into Mr. Williams' competency. I also note for the record the statements that I made yesterday in that my dealings - - and again, this is not dispositive, but certainly it should be clear for the record that my dealings with Mr. Williams have never to this point indicated that he might be incompetent to stand trial, have never raised a concern for me that I needed to inquire into his incompetency. And so I note that for the record as well.

### 3. *Analysis*

On this record, we cannot say that the trial court erred in declining to hold a formal competency hearing. After Appellant's trial counsel filed a motion for competency evaluation, the trial court conducted an informal inquiry into Appellant's competency. On multiple different occasions, Appellant's statements and answers to the trial court's questions indicated that Appellant fully understood the proceedings. The trial court stated that its dealings with Appellant indicated that Appellant was competent to stand trial.

Moreover, Appellant refused to participate in a competency evaluation. When questioned, he stated to the trial court that he believed that a formal competency evaluation would not be necessary. The trial court questioned Appellant at length and inquired on at least three different occasions about his motivation for refusing to participate in a competency evaluation.

Counsel claimed that Appellant's mental defect caused him to be unable to assist in the preparation of possible defenses. But it appears that this allegation was based on Appellant's inability to recall things. When the trial court asked counsel whether he was claiming Appellant had an inability to remember or an inability to connect with reality, counsel's answer indicated Appellant had an inability to remember and relate events that occurred at the time of the offense. But an inability to remember the facts of an offense does not establish incompetency to be tried. In *Morris v. State*,[31] we addressed whether a defendant was competent to stand trial due to amnesia caused by a boat crash. We held that the defendant was "competent to stand trial because he had (1) a sufficient present ability to consult with the lawyer with a reasonable degree of rational understanding; and (2) a rational as well as factual understanding of the proceedings against him."[32] Counsel acknowledged that Appellant had a rational understanding of the charges against him and the potential consequences of the pending criminal proceedings. And any inability to consult with counsel with a rational degree of understanding was, as in *Morris*, based on his inability to remember things.

Finally, there is no evidence in this record indicating that any alleged inability to cooperate with counsel—either as to participating in jury selection or as to submitting to a competency

---

[31] 301 S.W.3d 281 (Tex. Crim. App. 2009).

[32] *Id.* at 294.

evaluation—was caused by mental illness or defect.[33] Trial counsel's assertions appear to show that Appellant would not cooperate in his defense. In addition to Appellant's memory loss, trial counsel also asserted that Appellant had mental defects. But trial counsel did not establish that Appellant's lack of cooperation was caused by mental defects. Here Appellant's actions and answers to the trial court's inquiries indicated that he had a rational understanding of the proceedings against him. Based on the record before us, the trial court did not err in concluding that there was not evidence to support a finding of incompetency and that a formal competency trial was not required.

Having rejected all of Appellant's arguments in his second point of error, we overrule it.

### C. Pre-Trial Detention

In his third point of error, Appellant alleges that his pre-trial detention in administrative segregation for more than five years violated his rights under the Due Process Clauses of the Fifth and Fourteenth Amendments. Appellant argues that his pre-trial detention in administrative segregation diminished his "ability to assist his defense . . . due to the lack of human interaction," robbed him of "the trust he may have had in counsel," and took "the right not to testify from him." The State responds that "Appellant relies on inapplicable law . . . and proposes no remedy for the alleged violation."

It is well settled that pre-trial detainees have a constitutional right to be "free from

---

[33] *See Turner*, 422 S.W.3d at 691 ("The fact that a defendant is mentally ill does not by itself mean he is incompetent. Nor does the simple fact that he obstinately refuses to cooperate with his trial counsel. Indeed, even a mentally ill defendant who resists cooperating with his counsel may nevertheless be found competent if the manifestations of his particular mental illness are not shown to be the engine of his obstinacy.") (internal citations omitted).

punishment."[34]  That right is derived from the Due Process Clause of the Fourteenth Amendment, which protects such detainees from punishment "prior to an adjudication of guilt in accordance with due process of law."[35]  "Typically, a substantive due process claim pursued by a pretrial detainee challenges the general conditions of confinement or the treatment of all detainees in a specific facility."[36]  "Such substantive due process claims advance a central purpose of *Bell*: to ensure that pretrial detainees are not punished before they have been found guilty."[37]

But as the wide breadth of federal case law indicates, Appellant's claim is available only under Section 1983 or a state-law civil remedy.[38]  Appellant cites no authority—nor could this Court find any—that supports Appellant's argument that his pre-trial confinement, if unlawful, constitutes a ground to set aside his conviction.  We decline to create such a rule today.  Appellant's third point of error is overruled.

### III. PUNISHMENT

---

[34]  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979).

[35]  *Id.*

[36]  *Williamson v. Stirling*, 912 F.3d 154, 174 (4th Cir. 2018).

[37]  *Id.* (citing *Bell*, 441 U.S. at 535).

[38]  *See, e.g.*, *Houston v. Maricopa County*, 116 F. 4th 935, 939-40 (9th Cir. 2024) (discussing alleged violations of Fourteenth Amendment rights guaranteed to pretrial detainees in the context of Section 1983 claims); *Pittman by & through Hamilton v. Madison Cnty., Ill.*, 108 F.4th 561, 566 (7th Cir. 2024) (same); *Blackmon v. Sutton*, 734 F.3d 1237, 1239 (10th Cir. 2013) (same); *Hubbard v. Taylor*, 399 F.3d 150, 164–67 (3d Cir. 2005) (same); *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996) (same); *Thompson v. Cnty. of Medina, Oh.*, 29 F.3d 238, 242 (6th Cir. 1994) (same).

### A. Jury Selection[39]

In his first point of error, Appellant argues that the State should have been prohibited from exercising peremptory strikes and making challenges for cause against jurors based on their negative attitudes against the death penalty. Appellant appears to argue that jury service is a fundamental right and that excluding venirepersons based on their beliefs violates that right. So, Appellant urges, he suffered constitutional harm when venirepersons with beliefs against the death penalty were excluded from the jury panel. In response, the State argues that this error was forfeited.

Preservation is a systemic requirement.[40] A first-tier appellate court may not reverse a judgment of conviction without first addressing any issue of error preservation.[41] Most complaints are forfeited by a failure to object; that is, they have to be preserved.[42] When a complaint has to be preserved, the party raising the complaint on appeal must have complained to the trial court in a timely fashion and stated the grounds for the ruling sought.[43]

The complaint at trial must match the claim raised on appeal.[44] "[A]ll a party has to do to

---

[39] We discuss Appellant's first point of error here because "voir dire error regarding a subject that a jury would consider only during the punishment phase of a trial is 'error affecting punishment only,'" and error would only result in remand for a new punishment hearing. *Ransom v. State*, 920 S.W.2d 288, 298 (Tex. Crim. App. 1994).

[40] *Darcy v. State*, 488 S.W.3d 325, 327–38 (Tex. Crim. App. 2016).

[41] *Id.*

[42] *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Crim. App. 2009).

[43] TEX. R. APP. P. 33.1(a)(1)(A) (requiring a "timely request, objection, or motion" that states "the grounds for the ruling that the complaining party sought"). The complaining party must also obtain a ruling or object to the trial court's refusal to rule. *Id.* 33.1(a)(2).

[44] *Wood v. State*, 693 S.W.3d 308, 323 (Tex. Crim. App. 2024) (citing *Butler v. State*, 872

(continued...)

avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it."[45]

In the trial court, Appellant either (1) failed to object to the trial court granting the State's challenge for cause;[46] (2) failed to object to the State's use of a peremptory strike;[47] or (3) did not object to the State's use of a peremptory strike on the basis that the strike violated a venireperson's "fundamental right" to serve on a jury.[48] A claim that the trial court erred in sustaining a challenge for cause is subject to procedural default.[49] A complaint about the nature of the State's exclusion of a venireperson is likewise subject to procedural default.[50] Appellant either failed to object at the trial court or raises arguments on appeal not put forward in the trial court. We overrule Appellant's

---

(...continued)
S.W.2d 227, 236 (Tex. Crim. App. 1994)).

[45] *Rios v. State*, 665 S.W.3d 467, 476 (Tex. Crim. App. 2022) (quoting *Lankston v. State*, 827 S.W.2d 907, 909 (Tex. Crim. App. 1992)).

[46] Juror No. 116. The State challenged Juror No. 116 for cause. The trial court granted the State's challenge. Appellant did not object to the trial court's ruling.

[47] Juror No. 16. The State challenged Juror No. 16 for cause. The trial court denied the challenge. The State used a peremptory strike and Appellant did not object.

[48] Juror Nos. 13 and 17. While *Batson* challenges were made for both jurors, trial counsel did not complain that the State's use of peremptory strikes due to the venirepersons' objections to the death penalty violated a fundamental right to serve on the jury.

[49] *Compton v. State*, 666 S.W.3d 685, 713 (Tex. Crim. App. 2023); *Simpson v. State*, 119 S.W.3d 262, 267 (Tex. Crim. App. 2003).

[50] *Batiste v. State*, 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994) (explaining that, in the context of *Batson* peremptory challenges, "failure to object to prosecutorial use of peremptory challenges . . . before the jury is sworn forfeits a defendant's chance to obtain a hearing at which the prosecutor can offer race-neutral explanations to rebut his prima facie case, if any, of purposeful discrimination.") (ellipses inserted).

first point of error.

## B. Exclusion of Evidence

In his fourth point of error, Appellant claims the trial court abused its discretion in excluding parts of a deposition taken of Appellant's grandmother prior to trial. Appellant argues that the evidence is relevant, admissible mitigation evidence. At trial, the State objected on the basis that the evidence was irrelevant.

### 1. *Applicable Law*

In a capital sentencing trial, evidence may be presented "as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty."[51] "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[52] Mitigating evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[53] Once the threshold test for relevance is met, the trial court should admit

---

[51] TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

[52] *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *see also Eddings v. Oklahoma*, 455 U.S. 104, 113–14 (1982); TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1) (providing that, during a capital trial, evidence may be presented "as to any matter that the court deems relevant to sentence, including evidence of the defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty").

[53] *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)) (internal quotation marks omitted); *see also Ex parte Smith*, 309 S.W.3d 53, 56

(continued...)

evidence that a juror could reasonably find warrants a sentence less than death.[54] But the Supreme Court has never held that a state court must admit any and all proffered mitigating evidence no matter how irrelevant, unreliable, or cumulative.[55] The federal constitution does not require the admission of mitigating evidence that is otherwise objectionable under state law.[56]

## 2. *The Evidence*

Defendant's Exhibit 138 is a 156-page deposition of Appellant's grandmother, Norma Jean Smith. The trial court excluded everything in the deposition through the fourteenth line on page 79 and admitted the remainder of the document. For purposes of Appellant's fourth point of error, we set forth the evidence in the excluded part of the exhibit.

Smith was born in Houston in January of 1945. At the time of the deposition, she lived in Beaumont. She testified that her mother (Appellant's great-grandmother) had moved her and her siblings there at a young age to "be free" from an old marriage. Her mother was often involved with other married men. She would leave Smith and her siblings alone at the house, sometimes for a month at a time. Smith testified that her mother was more focused on her lifestyle than Smith and her siblings and that they would often go hungry.

One of the men in her mother's life raped Smith when she was thirteen years old and

---

(...continued)
(Tex. Crim. App. 2010) (discussing low relevance threshold); TEX. R. EVID. 401.

[54] *Tennard*, 542 U.S. at 285.

[55] *Wells v. State*, 611 S.W.3d 396, 409 (Tex. Crim. App. 2020).

[56] *Jenkins v. State*, 493 S.W.3d 583, 608 n.67 (Tex. Crim. App. 2016); *see also Valle v. State*, 109 S.W.3d 500, 507 (Tex. Crim. App. 2003) ("The fact that appellant was not able to present his case in the form he desired does not amount to constitutional error when he was not prevented from presenting the substance of his defense to the jury.").

impregnated her. Her cousin was present during the rape. Smith's mother blamed Smith for the assault and nobody ever reported it to the police. Smith did not report the rape because she was worried her mother would make her life harder if she did. Smith's sister was also assaulted by her stepfather. Later, one of her mother's boyfriends tried to breastfeed off of Smith.

Smith quit school by fifth grade and was unable to read until she taught herself. She would stay at home to watch her younger siblings growing up. When her mother was home, she used physical abuse and knives to discipline Smith and her siblings. Smith recounted one instance when her mother cut Smith's brother's tongue with a knife to discipline him.

Smith had her first child at the age of fourteen. She had four children by the age of eighteen and her sixth by the age of twenty-four. For a short time, Smith lived alone at the age of fourteen or fifteen with her first born child, before moving back in with her mother. When she moved back in, her mother's boyfriend inappropriately touched her on at least one occasion. When she grew up, she often relied on government assistance and food stamps as a young working mother. In her early thirties, she went to a mental health professional and was diagnosed as bi-polar with anxiety and depressive disorders. Her son Lonnie was also diagnosed with a mental disorder.

Smith had a common-law marriage with Lawrence Lewis, the father of five of her six children. Smith testified that Lewis was not active in the lives of the children and would leave during Smith's pregnancies only to come back after. One day, Lewis told Smith that the children were not his responsibility, so Smith injured Lewis by throwing a pot of boiling oil at him.

### 3. *Analysis*

#### a. Relevance

The trial court did not abuse its discretion in finding that the proffered deposition testimony

was not relevant. During the punishment phase of trial, Appellant could proffer evidence of his "background or character."[57] But, though tragic, none of the evidence in the first seventy-nine pages of Smith's deposition was relevant to Appellant's "background or character." In fact, Appellant was not yet born at any point during the events Smith described in the challenged portion of the deposition. A defendant's *personal* family history is relevant to assessing his moral culpability.[58] But a defendant has to draw the connection between himself and the proffered evidence. Smith's brutal childhood and early adulthood are separate from Appellant's upbringing and do not make "any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[59] No deposition evidence tied Smith's upbringing directly to Appellant's background or character. Without such evidence, the trial court did not abuse its discretion in determining that this part of the deposition testimony was irrelevant.

### b. Harmless Error

Even assuming that the trial court erred in excluding the deposition testimony, the error was

---

[57] TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

[58] *See Wiggins v. Smith*, 539 U.S. 510, 512 (2003) ("Wiggins experienced severe privation and abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual molestation, and repeated rape while in foster care. His time spent homeless and his diminished mental capacities further augment his mitigation case."). In the context of ineffective assistance of counsel claims, this Court has held that a defendant's history is relevant to *Strickland*'s prejudice analysis. *See, e.g.*, *Ex parte Garza*, 620 S.W.3d 801, 825 (Tex. Crim. App. 2021) ("evidence includes a wealth of information about how parental neglect and incarceration, sexual and physical abuse, extreme violence, and exposure to drug-dealing and substance abuse influenced Applicant's upbringing."); *Ex parte Gonzales*, 204 S.W.3d 391, 400 (Tex. Crim. App. 2006) (evidence that Gonzales's father had (1) sexually and physically abused him starting at the age of six until the age of fourteen; (2) threatened to kill him on multiple occasions; and (3) molested his sister numerous times).

[59] *Tennard*, 542 U.S. at 284.

harmless.[60]  The State has the burden of proving that constitutional error was harmless beyond a reasonable doubt.[61]  When deciding whether error contributed to the punishment, factors to consider include the nature of the error, the probable implications of the error, and the weight the jury would likely have assigned to the error in the course of its deliberations.[62]  The presence of overwhelming evidence supporting the jury's verdict can also be a factor in the harmless error calculation.[63]

During the punishment stage of trial, the jury had before it evidence of the brutal nature of the offense—the double homicide of the mother and grandmother of Appellant's children stabbed to death with a knife by Appellant in front of Appellant's children—as well as the physical evidence connected with the crime.  And the State had presented additional punishment evidence showing that, while he was in custody, Appellant seriously assaulted another inmate.  In the defense's case-in-chief, Smith was just one of eighteen witnesses called by Appellant.  Appellant called several witnesses to mitigate his culpability and also called expert witnesses who testified about Appellant's cognitive deficits.  In sum, the challenged deposition testimony was a small part of a much larger mitigation case.  Assuming the trial court erred in excluding the deposition testimony, we conclude beyond a reasonable doubt that the error did not affect the jury's punishment decision.  We overrule Appellant's fourth point of error.

## IV. CONCLUSION

Finding no reversible error, we affirm the judgment of the trial court.

---

[60]  *See Wells*, 611 S.W.3d at 410.

[61]  *Id.* at 411 (citing *Williams v. State*, 958 S.W.2d 186, 194 n.9 (Tex. Crim. App. 1997)).

[62]  *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011).

[63]  *Motilla v. State*, 78 S.W.3d 352, 357 (Tex. Crim. App. 2002).

Delivered: November 6, 2024
Publish